**ROBERT E., et al., Plaintiffs,**

v.

**Michael LANE, et al., Defendants.**

**No. 81 C 1057.**

United States District Court,
N. D. Illinois, E. D.

Oct. 5, 1981.

Ruthanne DeWolfe, Legal Assistance Foundation, Chicago, Ill., for plaintiffs.

James R. Carroll, Asst. Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge.

At issue in this litigation is the constitutional sufficiency of the mental health care treatment offered inmates at Illinois' Stateville Correctional Center. The plaintiffs are seven prisoners who claim to have been denied needed therapy. They seek to represent all others similarly situated. The defendants are: Michael Lane, Acting Director of the Illinois Department of Corrections; Gayle Franzen, Lane's predecessor; William Craine, Deputy Director for Program Services, Illinois Department of Corrections; Richard DeRobertis, Chief Administrative Officer (Warden) at Stateville; Marvin Reed, DeRobertis' predecessor; Michael O'Leary, Assistant Warden for Program Services at Stateville; Phillip Elliott, Acting Medical Unit Administrator at Stateville; Dr. Meyer Kruglik, Stateville psychiatrist; and Muhammad Irfan, a psychologist at Stateville. The gist of the complaint is that the care provided by the defendants has been so lacking that plaintiffs have been subjected to "cruel and unusual" punishment within the meaning of the Eighth Amendment.[1] For relief, the plaintiffs demand that the court declare the existence of constitutional violation. *See* 28 U.S.C. § 2201. They further seek structural relief in the form of a mandatory injunction ordering the defendants to upgrade Stateville's mental health care program in numerous ways. The named plaintiffs in addition each seek $20,000 in damages from defendants Lane, Franzen, Craine, DeRobertis, Reed and O'Leary. Currently pending are three issues—the applicability of the doctrine of abstention[2], the legal sufficiency of the complaint's averments, and the appropriateness of class action treatment. For the reasons to follow, I hold that ab-

---

**1.** Technically, the Eighth Amendment is not in issue in this matter since that provision applies only to actions of the national government. State actors such as these defendants are instead bound by the Fourteenth Amendment's due process clause. However, since the latter incorporates the Eighth Amendment's prohibitions, *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), this distinction is merely one of form. All subsequent references to the Eighth Amendment should be understood in this light.

**2.** The abstention issue was raised *sua sponte* by the court. The parties have briefed the issue.

stention is inappropriate, that the complaint states a claim, and that a class should be certified.

## I. THE ALLEGATIONS

Plaintiffs' factual allegations are of two sorts. First there are general claims which provide an overview of mental health care treatment at Stateville. In addition, case histories of the individual named defendants are spelled out in some detail.

### A. *Generalized Claims*

Plaintiffs' assertions essentially boil down to the following accusation: "No [mental health] services are available at Stateville except such service as may be rendered by the administration of behavior-controlling psychotropic drugs, including large doses of an admixture of anti-psychotic drugs." Amended Complaint, ¶ 19(J). From the face of the complaint it appears that this state of affairs results primarily from a severe shortage of correctional personnel qualified to assist in mental health rehabilitation.[3] Though Stateville houses approximately 2200 inmates, only one part-time psychiatrist, Dr. Kruglik, is there employed. Psychologist Irfan is of course also available, but he has never—at least in Illinois— been certified to practice in the "free," i.e., outside, world. His competency is thus somewhat suspect. The same is true of Stateville's "counselors," none of whom has received any formalized training—clinical or academic—in mental health care matters. Security personnel are similarly untrained.

Stateville's ability to cope with inmate mental health problems is therefore limited. As could be expected, preventive treatment is nonexistent. Inmate medical records are not systematically reviewed. Inmates rather must actively seek out help. They can do this by requesting an interview with either Dr. Kruglik or Irfan. These defendants, however, have complete discretion in deciding whether or not to grant such a request,

and usually refuse to see the petitioning prisoner. Most would-be patients consequently never receive any treatment at all. Even when an inmate becomes so disturbed that he is destructive of self or others, the inmate in most cases is simply transferred to the "Special Evaluation Unit" (SEU). There he is "frequently required to sit or lie nude on the stone floor of his cell, separated from all human contact by [a] virtually soundproof cell door, for protracted periods of time." Amended Complaint, ¶ 12(I). No routinized policy for treating inmates there confined exists for the Special Evaluation Unit is not housed within the Stateville Medical Unit and is not staffed with employees who have been trained in mental health care matters.

Further, even when an inmate engages the attention of either Dr. Kruglik or Irfan, the inmate receives at best cursory treatment consisting primarily, as noted before, of pharmacological prescriptions. What is perhaps most distressing is that this "treatment" not only fails to help most inmates, but in addition affirmatively hurts some as well by rendering the "treated" inmate an addict of the prescribed drug. Compounding this problem in turn is the fact that Dr. Kruglik and Irfan often simply deny suspected addicts further medication and do not thereafter provide any treatment whatsoever for either the addiction itself or the underlying mental illness.[4]

Some inmates—those who have been diagnosed by either Dr. Kruglik or Irfan as psychotic—are eligible to be transferred to the Menard Psychiatric Center for additional treatment. The inmate's stay at Menard ends, however, as soon as "he no longer engages in blatantly psychotic behavior," whether or not his mental illness remains. Amended Complaint, ¶ 19(M). Retransfer to Stateville also occurs if an inmate becomes so repetitively violent that even involuntary injections of behavior-controlling drugs cannot subdue him. Prisoners re-

---

**3.** Plaintiffs' allegations are being presented as if factually true simply because all well-pleaded assertions must be accepted on a motion to dismiss.

**4.** On occasion, however, subordinate personnel violate the orders of Kruglik and Irfan by providing addicted inmates with further doses of addictive medication.

turned to Stateville for the latter reason are often placed in disciplinary segregation where the only treatment rendered is "haphazard diagnosis and the voluntary and involuntary administration of behavior-controlling psychotropic drugs . . . ." Amended Complaint, ¶ 19(P).

One final category of prisoners remains, those in protective custody. Inmates housed there are those who have been attacked or threatened by other prisoners. They too receive only drugs and "haphazard diagnosis." Not even short-term crisis counseling is provided for an inmate whose life has recently been threatened.

## B. *Case Histories*

Robert E.[5] is a twenty-three year old male who has been shuttled between Illinois prisons and mental health hospitals since 1976. He arrived at Stateville in September, 1979, accompanied by a master record file containing a previous diagnosis of paranoid schizophrenia. Shortly thereafter he received death threats from several inmates, causing him to suffer an acute psychotic breakdown marked by auditory hallucinations. He was moved to the SEU where Dr. Kruglik interviewed him once for less than five minutes, telling plaintiff that he did not need medication or psychotherapy, but rather needed only to learn to calm himself down. From the SEU Robert E. was moved to protective custody and then to disciplinary segregation. While in disciplinary Robert E. set fire to his mattress in a suicide attempt. A short talk with defendant Irfan followed, after which plaintiff was retransferred to the SEU for "control and observation." Two suicide attempts later he was again placed in disciplinary where he will reside until 1985.[6] During this entire series of events plaintiff made numerous unheeded calls for psychiatric aid.

William B. is a thirty-six year old male who entered Stateville in 1979. Soon after his arrival he learned that his life was in danger due to the fact that his trial testimony had implicated a member of a gang prominently represented at Stateville. An acute anxiety attack set in and plaintiff was transferred at his own request into protective custody. There his attacks have become progressively so severe that only compulsive masturbation can reduce in any way his "overwhelming sense of terror." Amended Complaint, ¶ 21(D). He has been interviewed by Dr. Kruglik, but only once and for less than five minutes. Defendant Irfan has similarly seen plaintiff once, telling William B. only that compulsive masturbation by prisoners is normal. In addition, an unidentified staff physician once prescribed tranquilizers for three days. Despite these visits, plaintiff's anxiety attacks have not subsided in the least. In addition, he has recently developed a nervous tic in his face and a stammer in his speech. His thought processes are increasingly slowed and confused.

Larry K. is twenty-one and entered Stateville in December 1980 upon transfer from the Menard Psychiatric Center. Participation in a racial fight at Menard caused both this shift and his being sentenced to four-and-one-half years of disciplinary segregation at Stateville. There he alleges he has received absolutely no mental health therapy despite the fact that his master record contains previous diagnoses of paranoid schizophrenia. Instead a staff physician informed Larry K. in January 1981 that he suffers from epilepsy. Plaintiff, however, has never experienced a seizure and claims that this diagnosis was made solely to justify the involuntary injection of behavior-controlling drugs. The dosages he has subsequently received have been so great that they have caused him to be mentally confused, slurred in his speech and uncoordinated in general.

Kent C. is thirty-three and has lived at Stateville since 1979. Shortly after arrival he was threatened by inmates and attacked

---

**5.** Plaintiffs have brought this case without disclosing their last names in order to protect themselves from embarrassment.

**6.** In their motion papers, defendants assert without proof that Robert E. has been transferred from Stateville. Similar charges are also made in connection with Kent C.

by a cellmate who caused severe facial lacerations. At plaintiff's request he was moved into protective custody. He claims that he suffers from severe anxiety brought on by the attacks suffered both at Stateville and in previous institutions. Despite plaintiff's repeated requests for psychiatric therapy, he has received absolutely no assistance of any sort.

Hakim A–B is thirty-eight and suffered a nervous breakdown prior to entering Stateville. His breakdown occurred at the Pontiac Correctional Center following a threat on his life by fellow inmates who were angered by the assistance plaintiff had given Pontiac officials in various matters. Upon arrival at Stateville in February 1980, he was immediately placed in protective custody. From there he made numerous requests for psychiatric counseling. Neither Dr. Kruglik nor Irfan ever responded. The anxiety plaintiff felt became so intense that he voluntarily returned in January 1981 to the prison's general population so as to be eligible for Stateville's educational, recreational and rehabilitative programs. Though he now lives there in constant fear for his life, defendants have yet to provide him with any therapy whatsoever.

Twenty-two year old Derrick S. entered Stateville on December 11, 1980 and was placed in disciplinary segregation with a cellmate of known violent propensities. During the next five days plaintiff's cellmate raped him three times at knife point and forced a broom handle up his rectum. Following his release on December 17, Derrick S. began to experience severe anxiety and depression for which he never received any counseling.[7] Instead, he was transferred to the SEU as a suicide prevention measure. There he currently resides brooding alone most of the day over what has happened to him. His depression has become so pronounced that it is beginning to impair his thought processes.

Finally there is Calvin R., a twenty-one year old sent to Stateville in December 1980

from Menard where he had been undergoing "treatment" for anxiety and depression brought on by a gang-rape suffered at Pontiac. Since arriving at Stateville plaintiff has been continually threatened with both rape and death. Inmates and guards, moreover, constantly call him "punk" or "sissy." As a result of the threats and harassment Calvin R.'s depression is getting worse. Thoughts of suicide "are occurring with increasing frequency and detail." Amended Complaint, ¶ 26(H). He has seen defendant Irfan, but has been told only that he and his suicidal thoughts are "normal" for prisoners. Dr. Kruglik has never even granted a request for an interview.

## II. THE APPLICABILITY OF ABSTENTION

Before considering the merits of an abstention analysis, the Seventh Circuit has adomonished that all doubt as to subject matter jurisdiction must be resolved. *Miller-Davis Co. v. Ill. S. Toll Highway Auth.*, 567 F.2d 323, 326 (1977). In federal question litigation, this inquiry boils down to whether the asserted federal claim is "so insubstantial, implausible, foreclosed by prior decisions of this Court or otherwise completely devoid of merit as not to involve a federal controversy within the jurisdiction of the District Court, whatever may be the ultimate resolution of the federal issues on the merits." *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666–7, 94 S.Ct. 772, 776–7, 39 L.Ed.2d 73 (1974); *accord, Hagans v. Lavine*, 415 U.S. 528, 543, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974). Plaintiffs' constitutional argument clearly surpasses this low threshold. *See Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

The argument for abstention is simple. Whenever a case can be decided on either state law or federal constitutional grounds, state law resolution should be preferred given the long-standing policy of avoiding unnecessary constitutional deci-

---

7. He was also never properly treated for the purely physical ailments caused by the cellmate's attack.

sion-making. *Siler v. Louisville & Nashville Railroad Co.*, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909). Furthermore, whenever the scope of the underlying state law is "unclear," the courts of the affected state should be given the opportunity to adjudicate, since they—and not the federal courts—are the ultimate arbiters of state law. *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). To the extent then that state law is both unclear and subject to an interpretation which moots federal constitutional analysis, a federal court under the *Pullman* doctrine should stay its hand and "abstain" from ruling pending state court resolution of the disputed state law question.

These principles are potentially relevant due to the existence of Ill.Ann.Stat. ch. 38, § 1003–7–2(d) (Supp.1981–2) (Smith-Hurd) (emphasis added) which provides:

> All institutions and facilities of the Department [of Corrections] shall provide every committed person with a wholesome and institutional diet at regularly scheduled hours, drinking water, clothing adequate for the season, bedding, soap and towels and *medical and dental care.*

Illinois statutory law thus arguably guarantees plaintiffs the very rights they seek to establish through constitutional argument.

■ In response, plaintiffs argue that regardless of the clarity and scope of this statute, any argument in favor of abstention is "doubly flawed." First they assert that since they have not asked for any pendent state law relief, "[t]here is simply no issue of state law before this Court which would justify the application of *Pullman* abstention." Memorandum in Opposition to Abstention at 4. A plaintiff's unilateral decision to forego potential state law claims does not, however, automatically bar a federal court from abstaining. In both *Askew v. Hargrave*, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971), and *Harris County Commissioners v. Moore*, 420 U.S. 77, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975), the Supreme Court ordered abstention even though the plaintiffs there too had not included in their complaint a state law count for relief. *See*

*also Wisconsin v. Constantineau*, 400 U.S. 433, 440, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (Burger, C. J., dissenting). Policy as well argues against plaintiffs' contention:

> [A] federal court, in order to serve the federal purpose of avoiding unnecessary constitutional adjudication, must have the power to consider abstention on its own motion. The power must extend to considering a state law ground for invalidation of a challenged enactment although the plaintiff has not raised that issue at all; otherwise the plaintiff, whose interests abstention is not designed to serve, would control abstention by his pleading.

Field, *Abstention in Constitutional Cases: The Scope of the* Pullman *Abstention Doctrine*, 122 U.Pa.L.Rev. 1071, 1144 n.198 (1974) (hereinafter cited as Field).

■ Plaintiffs secondly argue that ordering abstention is tantamount to requiring exhaustion of state remedies, a step asserted to be beyond the power of a District Court hearing a case brought, like the present matter, pursuant to 42 U.S.C. § 1983. *McNeese v. Board of Education*, 373 U.S. 668, 82 S.Ct. 1433, 10 L.Ed.2d 622 (1973); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). This argument overlooks the Supreme Court's supervening decision in *Askew v. Hargrave, supra*. There the Court held that abstention merges with exhaustion only when the state law claim at issue is for all intents and purposes the "same" as plaintiff's federal claim. *Id.* at 478, 91 S.Ct. at 858; *Drexler v. Southwest Dubois School Corporation*, 504 F.2d 836, 839 (7th Cir. 1974) (en banc). For when such congruence is present—when, for example, the relevant state law provision is simply a "mirror image" of a particular federal constitutional guarantee—an abstention order simply delays a federal court's constitutional inquiry in favor of a state court hearing on the very same federal question. Since the policy of avoiding *all* constitutional adjudication is not thereby served, abstention in such a context is inappropriate. Section 1983 plaintiffs cannot be forced to exhaust all potential opportunities for obtaining state

court approval of what are essentially federal claims. *See generally* Field, *supra,* at 1080–4, 1099 n.108.

To come within the protection of this doctrine these plaintiffs must therefore show that a claim under the pertinent Illinois statute poses the "same" issues as an Eighth Amendment challenge. This they cannot do. To prevail on the latter ground, plaintiffs must show that their injuries were caused by more than mere negligence on the part of the named defendants. *Estelle v. Gamble, supra,* 429 U.S. at 106, 97 S.Ct. at 292. A state law claim might, by contrast, only require proof that plaintiffs have been denied "medical services of a level and quality commensurate with good medical practice." *Lightfoot v. Walker,* 486 F.Supp. 504, 508 (S.D.Ill.1980). The disparity in standards seems apparent.

The appropriateness of abstention thus depends on the presence of the traditional *Pullman* requirement: a state law which is both unclear and subject to a potentially mooting construction.[8] As for unclarity, I note as an initial matter a statement made by the Project Director and Reporter for the Illinois Unified Code of Corrections, the general law of which Section 1003–7–2(d) is a part. The Unified Code, in this individual's view, definitely "does recognize the need for medical and mental health services for those who require them." McAnany, *Imprisonment Under the Illinois Unified Code of Corrections: Due Process, Flexibility, and Some Future Doubt,* 49 Chicago-Kent L.Rev. 178, 181–2 (1972) (footnote omitted). Professor Field's discussion of a similar situation has convinced me, however, that it would be highly inappropriate for me to hold on such slender evidence that Illinois law does indeed grant plaintiffs the rights they seek to establish in this case:

[C]onsider, for example, a case concerning a right to treatment to be inferred from a state constitutional provision that arguably grants the right but that well may not. Even if a federal district court believes that the state supreme court would recognize the right, such an important announcement of state policy arguably should be made by the state judicial system rather than the federal.

Field, *The Abstention Doctrine Today,* 125 U.Pa.L.Rev. 590, 608–9 (1977). I am left with two options: holding either that plaintiffs have no claim under state law or that the statute is so ambiguous that I cannot offer with any confidence an authoritative interpretation either way. Neither Illinois case law[9] nor the face of the statute itself support the first route. By default if nothing else, I hold that Section 1003–7–2(d) is "unclear" within the meaning of *Pullman.*

■ Abstention fails in this case, however, because the statute cannot moot entirely plaintiffs' constitutional claim. To understand why, it must be remembered that plaintiffs are seeking both equitable and monetary relief. Constitutional analysis can thus be avoided only if state law offers plaintiffs the possibility of success on both claims. This it does not, for in Illinois an absolute immunity shields from personal liability all state officials who are engaged in "governmental" activities. Since this doctrine very probably embraces the damage claims here at issue, *see Mora v. State,* 68 Ill.2d 223, 12 Ill.Dec. 161, 369 N.E.2d 868 (1977); *Watson v. St. Annes Hospital,* 68 Ill.App.3d 1048, 25 Ill.Dec. 411, 386 N.E.2d 885 (1st Dist. 1979); *Madden v. Kuehn,* 56 Ill.App.3d 997, 14 Ill.Dec. 852, 372 N.E.2d 1131 (2d Dist. 1978), plaintiffs' constitution-

---

**8.** Towards the end of their brief, plaintiffs further suggest that abstention is *per se* improper in prison cases, given the Supreme Court's recent reiteration that it is the duty of the federal judiciary to police the conditions of confinement. *See Rhodes v. Chapman,* 452 U.S. 337, 351, 101 S.Ct. 2392, 2401, 69 L.Ed.2d 59 (1981). This argument has some force. In view of my analysis of the particularities of Illinois law, however, I need not ground my decision on such a sweeping basis.

**9.** In fact, the Illinois judiciary has apparently never interpreted the statute's substantive reach at all. Though nondispositive, *Harman v. Forssenius,* 380 U.S. 528, 534–5, 85 S.Ct. 1177, 1181–2, 14 L.Ed.2d 50 (1965), this state of affairs obviously supports a finding that the statute is "unclear."

al arguments must eventually be reached. Abstention cannot here serve its central function.

### III. THE SUFFICIENCY OF THE ALLEGATIONS

█ The Eighth Amendment places several limits on state power. It outlaws all criminal punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (joint opinion). Similarly, it bars criminal penalties that are grossly disproportionate to the severity of the crime committed. *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977) (plurality opinion). It substantively limits as well the power of the state to deem certain transactions criminal. *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Plaintiffs here primarily invoke the first strand of this jurisprudence.

#### A. The Requirement of "Pain"

█ In order to prevail on a claim of "unnecessary and wanton infliction of pain," plaintiff-prisoners must first establish that they have suffered "pain" within the meaning of the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Prisoners must do more, for example, than merely allege that they have been denied access to rehabilitative programs. *Id.* Allegations that serious medical needs have gone unattended are, on the other hand, clearly sufficient. *Estelle v. Gamble, supra*, 429 U.S. at 104, 97 S.Ct. at 291. As defendants concede, *Estelle* makes clear that "pain" is present whenever an inmate is forced to bear the untreated consequences of a serious medical problem. In that case the Court dealt with a prisoner's claim that he had been denied treatment for a physical—rather than a mental—disability. In line with previous lower court decisions, the Court held that "the denial of medical care

is cruel and unusual because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose." *Rhodes v. Chapman, supra*, 101 S.Ct. at 2399. Defendants can thus only argue that *Estelle* should be confined strictly to its facts, that only physical, and not mental, health care constitutes "medical care" within the meaning of the decision. This argument I find impersuasive, for I can deduce no reason in logic or policy for treating mental and physical afflictions so differently:

> Mental illness, like physical illness, occasions pain and suffering in the afflicted. The refusal to treat, in combination with the state's conduct in confining the individual in a manner that prevents him from getting any help on his own, therefore amounts to the infliction or aggravation of pain and suffering.

Comment, *Right to Treatment for the Civilly Committed: A New Eighth Amendment Basis*, 45 U.Chi.L.Rev. 731, 747 (1978). Several other courts, I note, are in agreement with this view. *See Ramos v. Lamm*, 639 F.2d 559, 574–5 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979); *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977); *Ruiz v. Estelle*, 503 F.Supp. 1265, 1338 (S.D.Tex.1980); *Laaman v. Helgemoe*, 437 F.Supp. 269, 313 (D.N.H.1977); *see also Finney v. Hutto*, 410 F.Supp. 251, 258 (E.D.Ark.1976), *aff'd on other grounds*, 548 F.2d 740 (8th Cir. 1977), *aff'd*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Newman v. Alabama*, 349 F.Supp. 278 (M.D. Ala.1972), *aff'd*, 503 F.2d 1320 (5th Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975); *cf. Harrington v. DeVito*, 656 F.2d 264 (7th Cir. 1981) (argument that pre-trial detainees have a constitutional right to adequate mental health care not frivolous.[10] Accordingly, I hold

---

**10.** The defendants cite three cases as establishing the proposition that the Supreme Court "has never found that persons confined to state institutions have a constitutional right to psy-

chiatric treatment." Memorandum in Support of the Motion to Dismiss at 4. This statement is somewhat correct, for it is true that the Supreme Court has never declared the exist-

that an inmate suffers Eighth Amendment "pain" whenever that inmate must endure the untreated effects of a serious mental illness.

On a more operational level plaintiffs must allege (1) that they suffered at some point during their incarceration from a serious mental illness, and (2) that they continued to so suffer at the time the complaint was filed.[11] Elaborate analysis is unnecessary to find that this test is clearly met by the averments contained in the seven case histories recounted above. Acute depression, paranoid schizophrenia and nervous collapse are all disorders which are sufficiently serious so as to be potentially actionable in this court.

### B. *The Requirement of "Deliberate Indifference"*

Justice Brennan has argued that "[i]n determining when prison conditions pass beyond legitimate punishment and become cruel and unusual, the 'touchstone is the effect upon the imprisoned.'" *Rhodes v. Chapman, supra,* 101 S.Ct. at 2408 (concurring in judgment) (quoting *Laaman v. Helgemoe, supra,* 437 F.Supp. at 323). This view has never commanded a Court majority. *Estelle* clearly mandates that Eighth Amendment analysis must go beyond an inquiry into "effect." A court cannot hold for a plaintiff solely on the basis that he or she has been forced to endure what I have called constitutional "pain." Rather, a plaintiff must additionally show that this "pain" was caused by the named defendant's "deliberate indifference" to plaintiff's plight. *Estelle v. Gamble, supra,* 427 U.S. at 104–6, 97 S.Ct. at 291–2. To paraphrase the *Gregg* opinion, the "pain" in question must be *unnecessarily and wantonly* inflicted.

In ascertaining what is here meant by the term "deliberate indifference," it is useful to look beyond *Estelle.* For in that case the plaintiff sought only damages for what the Court assumed was an isolated instance of medical mistreatment. Here, by contrast, the plaintiffs seek legal and equitable relief for injuries allegedly occasioned by a prison's very system of mental health care treatment. Plaintiffs are bringing what has come to be known as a "structural suit"; they are challenging the very "bureaucratic dynamics" at work at Stateville and not simply a collection of past, discrete, *Estelle*-like incidents.[12] *See generally* Fiss, *The Supreme Court, 1978 Term—Foreword: The Forms of Justice,* 93 Harv.L.Rev. 1, 18 (1979). In such a context, courts have generally settled upon two standards of proof. First, "[a] series of incidents closely related in time . . . may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners." *Bishop v. Stoneman,* 508 F.2d 1224, 1226 (2d Cir. 1974). This is so because "while a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment

ence of such a right. More importantly, however, The Court has never—in the three cited decisions or elsewhere—intimated that such a right does not exist in the prison context. Both *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) and *Sanchez v. New Mexico,* 80 N.M. 438, 457 P.2d 370, *appeal dismissed for want of jurisdiction,* 396 U.S. 276, 90 S.Ct. 588, 24 L.Ed.2d 469 (1970) dealt with the law surrounding civil commitments. *Pennhurst v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), concerned the Developmentally Disabled Assistance and Bill of Rights Act. None of these decisions is pertinent to this case.

**11.** There may be rare cases in which a now-cured plaintiff seeks damages for a defendant's failure to respond more quickly to his prior suffering. I leave open for now what must be plead in such a situation.

**12.** To be sure the plaintiffs do describe in their complaint numerous individual instances of suffering. As I read the complaint, however, these episodes are not intended to stand or fall on their own individual merits; rather they are presented as representative evidence of how Stateville's bureaucratic dynamics affect the entire inmate population. Significantly, plaintiffs' damage claims are *not* asserted against Elliott, Kruglik, and Irfan, the three defendants most closely associated with the actual "treatment" received by plaintiffs. This supports the interpretation that plaintiffs are ascribing their injuries to uniform, systemic factors, rather than to varied causes, each unique to a given case history.

bespeak a deliberate indifference by prison authorities to the agony engendered by haphazard and ill-conceived procedures." *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977). Alternatively, deliberate indifference can be reflected by "systematic deficiencies in staffing, facilities or procedures [which] make unnecessary suffering inevitable . . . ." *Id.* Approving these two tests are the following decisions: *Ramos v. Lamm, supra,* 639 F.2d at 575; *Ruiz v. Estelle, supra,* 503 F.Supp. at 1330; *Lightfoot v. Walker, supra,* 486 F.Supp. at 509; *Palmigiano v. Garrahy,* 443 F.Supp. 956, 984 (D.R.I.1977).

Under either standard the motion to dismiss fails. The seven case histories listed in the complaint disclose an actionable "series of incidents" within the meaning of the above decisions. Defendants disagree, arguing first that these incidents are not closely enough related so as to evidence a pattern of insufficient care. The instances at issue, they note, transpired over a period of years whereas those in *Bishop* occurred within months. They point out as well that the plaintiffs do not all suffer from the identical mental disorder. Neither argument undercuts a finding of pattern. Eighth Amendment law recognizes no set timetable in which all relevant instances must occur. Incidents separated by as much as three years have been found to constitute a pattern. *Lightfoot v. Walker, supra,* 486 F.Supp. at 525. That each plaintiff's illness was not a carbon copy of his co-plaintiff's, moreover, is irrelevant. What is relevant is that each plaintiff has been subjected to the very same constitutional "pain," namely, the suffering occasioned by an untreated and serious mental disorder. No greater congruence of claims is required.

■ Defendants further argue that even if the case histories are related, they are all insufficient as a matter of law. The very most that can be deduced from any single instance, they claim, is a finding of negligence, not deliberate indifference. This argument reflects a fundamental misunderstanding of the "series of incidents" test. The focus there is not on each individual incident viewed in isolation, but rather, on the entire "cumulation of incidents" examined as a totality. *Bishop v. Stoneman, supra,* 508 F.2d at 1226 (reversing District Court on this point). The determinative factor is the existence of a *pattern* of suffering. For once one is shown, a presumption is raised that the described incidents of suffering were not random occurrences. On the contrary, it becomes reasonable to presume both that these events transpired for some "reason," and that prison authorities are responsible, given the almost total control they exercise over prisoner living conditions. That any one prisoner was merely the victim of physician negligence is thus irrelevant. A pattern of similar instances [13] presumptively indicates that prison administrators have, through their programs and procedures, created an environment in which negligence is unacceptably likely. *See Ramos v. Lamm, supra,* 639 F.2d at 575 ("repeated examples of negligent acts" prove deliberate indifference); *Smith v. Sullivan,* 553 F.2d 373, 378 (5th Cir. 1977) ("Though isolated incidents of negligence might not constitute sufficient basis for Sec. 1983 jurisdiction, patterns of negligence may.") As Justice Stevens has explained:

> Like the rest of us, prisoners must take the risk that a competent, diligent physician will make an error. Such an error may give rise to a tort claim but not necessarily to a constitutional claim. But when the State adds to this risk, as by providing a physician who does not meet minimum standards of competence or diligence or who cannot give adequate care because of an excessive caseload or inadequate facilities, then the prisoner may suffer from a breach of the State's constitutional duty.

---

**13.** This is not to say that negligence—any more than deliberate indifference—must be shown in each individual episode. All each one must evidence is the existence of a common species of Eighth Amendment "pain."

*Estelle v. Gamble, supra*, 429 U.S. at 116 n.13, 97 S.Ct. at 297 n.13 (dissenting opinion). The complaint, in sum, is sufficient under the "series of incidents" test to raise a presumption of illegal conduct. For the defendants to rebut such presumption, they must show that the pattern in question resulted in fact from a "reason" independent of their behavior, such as the possibly incurable nature of many mental illnesses. Any such development must await further factual proof.[14]

Objective analysis of Stateville's "staffing, facilities [and] procedures" leads to a conclusion that the complaint is sufficient under the second *Bishop* test as well. The well-pleaded allegations clearly establish that practically no mental health care delivery system exists at Stateville at all. The "staff" consists solely of one part-time psychiatrist, one non-registered psychologist, and several untrained counselors. What treatment these individuals offer is, moreover, virtually inaccessible to the inmate population. In the main, prospective patients either are refused treatment altogether or are dispensed pithy statements on the order of: "suicidal thoughts are normal." The hypodermic syringe provides the most that Stateville can offer in the way of "treatment."

Nor is this state of affairs mitigated by the potential availability of the Menard Psychiatric Center. For one thing, the complaint alleges that the services offered there are little better than the fare at Stateville. For another, one federal judge has already found that the Menard facility is "grossly deficient." *Lightfoot v. Walker, supra*, 486 F.Supp. at 522.

Plaintiffs' allegations thus meet the requirements of each test that has been proposed. Proof of these claims at trial will entitle them to declaratory and injunctive relief.

C. *Potential Good Faith Defenses*

■■■■ The request for monetary damages implicates an additional issue, the af-

firmative defense of qualified immunity. Under this doctrine, prison administrators cannot be held personally liable for concededly unconstitutional acts if they were undertaken both in subjective good faith and in the reasonable—though inaccurate—belief that they comported with constitutional standards. *Procunier v. Navarette*, 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978); *Knell v. Bensinger*, 522 F.2d 720, 724 (7th Cir. 1975). To make out their defense, defendants must thus establish both subjective and objective components. In the process they must necessarily prove up issues of fact, especially in connection with subjective good faith. Motions to dismiss are peculiarly inappropriate vehicles through which to make such showings. *Scheuer v. Rhodes*, 416 U.S. 232, 249–50, 94 S.Ct. 1683, 1692–93, 40 L.Ed.2d 90 (1974). This case is no exception. The motion to dismiss is denied in all respects.

## IV. THE APPROPRIATENESS OF CLASS ACTION TREATMENT

■■■■ Having held that jurisdiction should be retained and that the complaint states a claim, I must now decide how this action should proceed. At issue is whether the plaintiffs should be certified as class representatives for "all persons who are or will be incarcerated at Stateville and who need or will need mental health services." Plaintiffs assert that their claims satisfy each and every requirement posed by subsections (a) and (b)(2) of Federal Rule 23.

### A. *Numerosity*

Under Rule 23(a)(1) a class action can be maintained only if the members of the class are "so numerous that joinder of all members is impracticable." In attempting to show this element plaintiffs offer no evidence as to the *actual* number of mentally disturbed prisoners housed at Stateville. Rather, citing expert testimony found in previous decisions, they rely solely on statistical estimates of prison psychiatric needs.

---

**14.** Other decisions indicate that proof of pattern raises a conclusive presumption of unconstitutional behavior. I think it only fair, however, that defendants be allowed to offer their side of the story.

From these figures, they conclude that between 160 and 1277 Stateville inmates fall within the proposed class definition.[15] Complete joinder is accordingly claimed to be impracticable. Defendants counter that plaintiffs' logic involves little more than "speculation" and "conjecture." The failure to offer concrete proof specific to Stateville, they claim, is fatal.

What is most striking, however, is defendants' concession that plaintiffs' class size estimate is "reasonable." Memorandum in Opposition to Class Certification at 3. In light of this remark, plaintiffs' analysis should be viewed as presumptively establishing the existence of numerosity. Defendants, furthermore, have done nothing to rebut this inference. They have pointed to no facts which undercut the accuracy of plaintiffs' statistics as applied to Stateville. Were any such data available, it would, I believe, have been produced by now, for defendants, and not plaintiffs, have greatest access to the relevant information. Defendants' failure to act is hence dispositive.

### B. *Common Questions*

Rule 23 next requires that there be "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). Here it becomes crucial once again to remember that this is a "structural" suit. Plaintiffs are arguing that the entire Stateville "system" of mental health care is deficient, that the very environment in which they reside has been poisoned by the defendants' behavior.

The claims of each class member thus necessarily embody common fact questions. Central to all is an identical inquiry into the nature of the overall system that actually existed during the period covered by the complaint. Corresponding to these determinations, moreover, is a common legal question, namely, whether or not the discovered system comported with constitutional standards. The requirement of 23(a)(2) is met.

### C. *Typicality*

Named plaintiffs must further present "claims or defenses . . . typical of the claims or defenses of the class." Fed.R. Civ.P. 23(a)(3). Defendants vigorously contend that the requisite typicality is not present. They argue that since each class member's mental disability is unique, no two of them could possibly have been the victims of similar injuries. Proof that the defendants reacted improperly to the class' suffering must, in their view, thus necessarily proceed on an individualized basis. This argument would have force if the complaint merely presented a collection of disparate and isolated claims. But as I have already stated twice, it does more; it alleges systemic behavior and harm. *See* pp. 939 and 942, *supra*. Under the well-pleaded allegations, each class member has been subjected to a regime of grossly inadequate care. Each, moreover, has suffered constitutional "pain" of similar type and form.[16] Linking each and every claim is thus a

---

15. Plaintiffs' arithmetic is incorrect. They base their calculations on the following factors: (1) expert testimony to the effect that between 10 and 35 percent of any given inmate population is actively psychotic, while an additional 50 percent suffers from other serious mental disorders; (2) that as of May 29, 1980 the entire Illinois prison system contained 11,168 inmates, approximately 20 percent of whom were housed at Stateville; and (3) that the Menard Psychiatric Center can accommodate only 315 patients. After several mathematical steps, they arrive at the conclusion that between 160 and 719 Stateville inmates are actively psychotic and that 1117 others are in serious need of psychiatric treatment. These figures indicate that the class ranges in size from 1277 (the sum of 160 and 1117) to 1836 (the sum of 719 and 1117).

16. This conclusion requires some explanation. Strictly speaking, the alleged facts indicate on their face only that the named plaintiffs have suffered "pain." No factual allegations specifically detail the actual past suffering of the remaining class members. However, the pattern disclosed by the named plaintiffs' case histories supplies the needed link. The very concept of "pattern" suggests that suffering does not occur randomly. *See* p. 940, *supra*. Rather, it indicates that life at Stateville is somewhat predictable, that those who are similarly situated are in all likelihood treated alike. Here the named and unnamed class members are indeed similarly situated; they all require treatment for serious mental disorders. See p. 943, *infra*. It is therefore reasonable to conclude that all have been dealt the identical fate of constitutional "pain."

central core of allegation. Viewed in this light, defendants' objections amount not to a charge that typicality is absent, but rather to an assertion that all class claims are not identical. Defendants are in essence complaining of differences in the *nuances* of each claim, i.e., the specifics of precisely how in each instance the challenged system manifested itself and to what degree. Yet, it is clear from my prior Eighth Amendment analysis that these peripheral differences are irrelevant.[17] All plaintiffs must prove is a common pattern of suffering, and for this, proof that each class representative's claim contains the central core mentioned above is sufficient. *See* pp. 940–941, *supra.* The claims here at issue, in short, are "typical enough" given the substantive legal requirements implicated by the complaint.[18] To the extent that the Court in *Burnham v. Department of Pub. Health of State of Ga.,* 349 F.Supp. 1335 (N.D.Ga.1972), *reversed on other grounds,* 503 F.2d 1319 (5th Cir. 1974) suggested otherwise, I respectfully disagree.

The contours of the proposed class must, however, be slightly altered in order to conform to this discussion. Crucial to the preceding analysis is an assertion that defendants' acts and omissions have caused each class member "pain." But *all* inmates who need mental health therapy—the sum and substance of the proposed class—do not experience Eighth Amendment "pain" even when state officers deliberately deny them treatment. Rather only those who require treatment for *serious* mental disabilities are candidates for constitutional deprivation. Any certification order must reflect this qualification.

### D. *Adequate Representation*

The final requirement of Rule 23(a) is that "the representative parties . . . fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). To pass this hurdle, two factors must be shown: "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins., Co.,* 508 F.2d 239, 247 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). Defendants do not challenge the competency of plaintiffs' counsel, and, indeed counsel's performance thus far evidences no grounds for doubt whatsoever. Rather defendants stress what they perceive to be a disharmony of interest between the named and the unnamed class members. Their argument is basically, however, a simple rehash of the charge that mental health care issues are necessarily individual disputes. My previous rejection of this claim applies with equal force here.

Still, some concern is generated by defendants' claim, as yet unsubstantiated, that both Kent C. and Robert E. have been transferred out of Stateville and into other Illinois institutions. *See* p. 934 n.6, *supra.* My concern derives from the hard reality that in all probability substantial amounts of money will be needed to effectuate any order I might issue in the event plaintiffs succeed in proving their charges. Such money will have to be found somewhere. Though I have been presented with no proof on the issue, I assume that the source of these funds would be the Department of Corrections' general budget. This budget, I further assume, is (a) somewhat fixed in amount, and (b) intended to fund all Illinois institutions and not just Stateville. As a result, every dollar spent at Stateville reduces in some amount those funds available elsewhere. What may be good for inmates

---

**17.** These differences might be relevant in computing the actual amount of compensable damage suffered by each class member. Plaintiffs, however, seek class certification only on their declaratory and injunctive demands.

**18.** Defendants secondarily argue that in the very least the claims of Robert E. and Kent C. are not "typical," since neither resides any

longer at Stateville. *See* p. 934 n.6, *supra.* I disagree. Even if these transfers have indeed taken place, such a fact would not deprive either man's claim of the necessary common allegations discussed in the text. Whether or not these transfers render Robert E. and Kent C. "inadequate" representatives, however, is a different question. I address it in IV. D., *infra.*

at Stateville may not be in the best interests of those housed in different institutions.

Nevertheless, I will not deny Robert E. and Kent C. representative status. For one thing, it is not yet clear that they have indeed been transferred. For another, the concerns I have outlined are speculative. Should a divergence in interest later become apparent, I am confident that remedial steps can then be devised. On the present record, such action is not now required.

### E. *Rule 23(b)(2) Standards*

 Lastly, plaintiffs argue that this suit can be maintained under subsection (b)(2). The latter authorizes class actions when

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole

Fed.R.Civ.P. 23(b)(2). Defendants make two arguments in response, neither of which has merit. They contend that each class member's claim is unique and that the named plaintiffs' damage prayers predominate over the equitable claims, thereby rendering potential class treatment fatally unmanageable. The first point I have rejected before. The second is frankly little better than frivolous. This case is a prototypical candidate for (b)(2) certification. *See* Fed.R.Civ.P. 23(b)(2), Advisory Comm. Notes, 39 F.R.D. 69, 102 (1966).

### V. ORDER

The motions to dismiss and abstain are denied in their entirety. The motion to certify the declaratory and injunctive demands is granted to the extent that plaintiffs may represent the following individuals:

> All persons who are or will be incarcerated at Stateville and who need or will need mental health services for serious mental illnesses.