Tom CAPPS, et al., Plaintiffs,

v.

Victor ATIYEH, et al., Defendants.

Joe WEST, et al., Plaintiffs,

v.

Victor ATIYEH, et al., Defendants.

Civ. Nos. 80–141BU, 80–6014BU.

United States District Court,
D. Oregon.

Dec. 30, 1982.

Supplemental Opinion and Order
Feb. 25, 1983.

Robert A. Stalker, Jr., Patricia DeLessio, Prisoners' Legal Services of Oregon, Salem, Or., for plaintiffs.

David Frohnmayer, Atty. Gen., Stanton F. Long, Deputy Atty. Gen., J. Scott McAlister, Virginia L. Linder, Asst. Attys. Gen., Salem, Or., for defendants.

## AMENDED SUPPLEMENTAL OPINION and ORDER

JAMES M. BURNS, Chief Judge.

### INTRODUCTION

This is the second round in the comprehensive challenge[1] to the living conditions in the Oregon prisons. The first opinion is reported at 495 F.Supp. 802 (D.Or.1980). This is a class action under 42 U.S.C. § 1983.[2] The class consists of the inmates at the Oregon State Correctional Institute (OSCI) and the Oregon State Penitentiary (OSP) and its farm annex (the Annex). The inmates claim the conditions of their confinement inflict cruel and unusual punishment forbidden by the eighth amendment of the United States Constitution[3]. Specifically, the inmates contend the institutions are so crowded the conditions there are likely to cause the inmates' physical and mental deterioration. Save for a few relatively narrow areas in which I find the inmates are entitled to prevail at this time, I deny most of their general claims for relief.

The United States Constitution's concern with penal principles does not go beyond bills of attainder and cruel and unusual punishments. It derives its restraints on state prison practices from generally applicable constitutional guarantees, including due process and equal protection. The Oregon constitution, by contrast, contains clauses expressly guaranteeing humane treatment of those prosecuted for crime. Or. Const. art. I, § 13: "No person arrested, or confined in jail, shall be treated with unnecessary rigor"; id., § 15: "Laws for the punishment of crime shall be founded on the principles of reformation, and not of vindictive justice"; id., § 16: "Excessive bail shall not be required, nor excessive fines imposed. Cruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense...."

In theory, Oregon's bill of rights provides a potentially broader ground for relief than the eight amendment. In this instance, however, the state and federal proscriptions against overly rigorous punishment are essentially the same. Though these bills of rights provisions have different historical antecedents, they are nonetheless based on "today's 'broad and idealistic concepts of dignity, civilized standards, humanity and decency.'" Hutto v. Finney, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978) quoting Estelle v. Gamble, 429 U.S. at 102, 97 S.Ct. at 290; see Sterling, 290 Or. at 622, 625 P.2d at 131. Both the United States and Oregon Supreme Courts draw upon the same contemporary expressions to define the parameters of this evolving societal standard of

---

1. A comprehensive challenge differs from a discrete adjudication. The latter targets a particular incident or practice. See, e.g., Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); Albers v. Whitley, 546 F.Supp. 726 (D.Or.1982); see generally Note, Complex Enforcement: Unconstitutional Prison Conditions, 94 Harv.L.Rev. 626, 628 (1981).

2. These are actually two consolidated cases, Capps v. Atiyeh, No. 80–141 and West v. Atiyeh, No. 80–6014. However, I will refer to them throughout as if they were but a single case, Capps/West.

3. The eighth amendment provides in full: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

Because this is a challenge to state incarceration, the inmates claim the protection of the Bill of Rights through the fourteenth amendment. See Robinson v. California, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962). The fourteenth amendment proscribes state deprivations of one's federal constitutional rights. A state does not deprive one of a federal constitutional right if state law proscribes the questioned conduct or condition. Linde, Without "Due Process": Unconstitutional Law in Oregon, 49 Or.L.Rev. 125, 131–35 (1970).

Section 1983 was enacted to provide a remedy where state law is inadequate. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Logically, a court must first evaluate the state's conduct in light of the state's laws. Only if the state's statutes and constitution permit the challenged conduct or condition must the court evaluate federal precedents. Sterling v. Cupp, 290 Or. 611, 616 n. 5, 625 P.2d 123, 127 n. 5 (1981). But cf. Ruiz v. Estelle, 679 F.2d 1115, 1156–59 (5th Cir.1982) (a federal trial court may not of its own volition, after trial, consider state law claims not pleaded by the plaintiff). The state recognized this when it asked me to abstain pending the resolution of a state court action. See text, infra, at 899.

## I. PROCEDURAL HISTORY OF THE CASE

### A. *Capps/West I*

With the consent of the parties, in the spring of 1980, and pursuant to Fed.R. Civ.P. 42(b), I segregated the issue whether these penal institutions are unconstitutionally crowded. I had anticipated that if the inmates made out a case in this area, relief granted in that area might well to some degree remedy some of the other conditions of which they complained: food, clothing, shelter, sanitation, medical care, and personal safety.

In June 1980, I took testimony from three inmates at OSP, four of the State's corrections officials, and eight expert witnesses. At that time, OSP housed 1476 persons despite a single-cell capacity of 1107. OSCI housed 773 inmates in a facility designed for 476. The Annex housed 206 persons though it was designed to accommodate 125. On June 27, 1980, I issued a bench ruling in favor of the inmates, holding that because of the overcrowding, the three institutions violated the eighth amendment. Following the parties' submission of proposals for the type of relief to be ordered, I issued an injunction requiring the State to reduce the population at the institutions by 500 inmates by December 31, 1980, and by another 250 inmates by March 31, 1981. This would reduce the prison's populations to single-cell and design capacities. I later extended the initial December deadline to January 31, 1981.

I denied the State's motion for a stay of the injunction pending the State's appeal. The court of appeals upheld this denial.

However, on February 4, 1981, Justice Rehnquist, as Circuit Justice, stayed the injunction pending resolution of either the decision of the court of appeals in this case or *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), which at that time was before the Court. *Atiyeh v. Capps,* 449 U.S. 1312, 101 S.Ct. 829, 66 L.Ed.2d 785 (1981) (Rehnquist, Circuit Justice). Ironically, by January 31, 1981, the State had reduced its inmate population by 487, within thirteen of the goal originally set. Following the Court's opinion in *Chapman,* the court of appeals vacated the injunction and remanded the case for "further consideration and specific findings" in light of *Chapman* and *Wright v. Rushen,* 642 F.2d 1129 (9th Cir.1981). 652 F.2d 823 (9th Cir.1981) (per curiam order).

### B. *Capps/West II*

Following the court of appeal's remand order, the State filed a motion asking me to abstain pending the resolution of the state law claims in *Armstrong v. Cupp,* No. 121,-599 (Marion County Cir.Ct., petition for habeas corpus filed July 22, 1980). I declined to stay the proceeding at this late stage largely because the state court ruling could not eliminate all of the federal constitutional claims. (Unpublished opinion). *Hoptowit v. Ray,* 682 F.2d 1237, 1245 n. 2 (9th Cir.1982); see *Manney v. Cabell,* 654 F.2d 1280 (9th Cir.1980).

In *Capps/West I,* I assumed, in the absence of case authority to the contrary or other appellate court guidance, that a court could consider the generalized impact of overcrowding on the penological effective-

---

decency. *Compare Rhodes v. Chapman,* 452 U.S. 337, 348 n. 13, 101 S.Ct. 2392, 2399–40 n. 13, 69 L.Ed.2d 59 (1981) *with Sterling,* 290 Or. at 622, 625 P.2d at 130–31. And both constitutions proscribe the unnecessary infliction of pain. *Sterling,* 290 Or. at 622–23, 625 P.2d at 131–32; *Gregg v. Georgia,* 428 U.S. 153, 186, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976) (joint opinion).

In addition, federal courts have more fully developed the issues in constitutional prison conditions litigation. The Oregon Supreme Court has yet to entertain a comprehensive challenge to prison conditions. The state bill of rights clauses are not so different from the federal that the Oregon Supreme Court would not draw upon this body of federal law for guidance.

I speak throughout this opinion of the eighth amendment. However, where I deny the inmates relief, I have concluded as an antecedent step in my analysis that the Oregon law does not forbid the challenged conditions. Where I grant the inmates relief, I have concluded the relief is necessary to satisfy Oregon law and the United States Constitution. Where necessary, I discuss Oregon law in greater detail.

ness of the challenged institutions. I am no longer without that authority or guidance. *Wright* and *Hoptowit* make it clear that a court faced with a comprehensive challenge to prison conditions must examine articulable, quantifiable conditions to see whether these discrete conditions violate eighth amendment standards. *But see Smith v. Fairman,* 690 F.2d 122, 125 (7th Cir.1982); *Ruiz v. Estelle,* 679 F.2d 1115, 1139–40 (5th Cir.1982). But each condition of confinement does not exist in a vacuum. A particular unconstitutional condition, such as excessive violence, may be the result of several contributing factors. *Hoptowit,* 682 F.2d at 1247.

At my request, the inmates submitted a proposed sequence for taking additional testimony about the separate conditions. The six areas selected for hearings were:

1. Violence and Guard Behavior
2. Segregation and Isolation
3. Shelter and Sanitation/Physical Plant
4. Idleness/Classification
5. Mental Health Care and Counseling
6. Medical Care

These topics were derived from *Wright,* 642 F.2d at 1132–33, *quoting Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir.1978), *rev'd on other grounds sub nom. Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979): "an institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety." *See Hoptowit,* 682 F.2d at 1246. The State's denial of one of these basic needs violates society's sense of decency because it wantonly inflicts pain.

From June through November 1982, I held hearings at which dozens of inmates at

OSP, OSCI, and the Annex, staff members, and finally expert witnesses testified.[4] The evidence taking sessions involving inmate and most staff testimony were held at the Marion County Courthouse and the Capitol Building in Salem.[5] Expert (and some staff) testimony was taken at the U.S. Courthouse in Portland. In addition, with counsel's consent, I inspected OSP and OSCI once by myself without advance notice, and once with counsel. The surprise visit was to observe the institutions operations in a fashion which might serve to reduce the temptation on the part of some staff or inmates to posture for my benefit. While my impression was that this effort was not entirely successful, such posturing as may have occurred has not affected my findings and conclusion.

The State objected, often in strenuous terms, to these unitary proceedings. However, these hearings were not held to cure factual deficiencies in the inmates' case. The hearings were held to insure that the findings of fact and conclusions of law would be according to the requirements of *Hoptowit* and *Wright.* The State also contended it was prejudiced by a lack of adequate discovery and of a pretrial order. Counsel for plaintiffs also occasionally complained of lack of timeliness in receipt of witness statements. Neither side has shown any prejudice. Most of the opportunities I furnished for other or fuller evidence presentation were not utilized.

## II. DISCUSSION

### A. *The Facilities*

The Oregon State Penitentiary is a maximum security prison located in Salem, Oregon. It comprises 22 acres and is surrounded by a reinforced concrete wall averaging

4. The skill of cooperation between the attorneys—Robert Stalker and Patricia DeLessio for the inmates and Scott McAlister and Virginia Linder, who carried the primary burden for the State—materially assisted the expeditious processing of this case. This case stands in a marked and welcome contrast to *Ruiz,* in which the lawyers' "testiness and personal involvement" pervaded, and indeed, necessitated many of the 159 days of trial. 679 F.2d at 1132.

5. As was the case in *Capps/West I,* this Court received almost daily mailings from inmates describing their living conditions and its perceived deficiencies. The findings and conclusions and the opinion filed today have been based on the record, and not on any of these communications.

25 feet in height. Prisoners are housed in five units. One of these cell blocks was built in 1929, two in the early 1950's, and the newest in 1964.

C Block, the oldest housing unit, has 157 cells of 60 square feet each. Sub-C, essentially a basement of C Block, contains 39 cells of 56.5 square feet each. Each cell contains two metal bed frames suspended from the wall, which occupy about one-third of the total cell area. An open toilet and a sink are provided in each cell. The remaining furnishings consist of shelves, a table that folds down from the wall, and two stools.

D and E Blocks each contain 400 cells of 44 square feet each. The beds in these cells occupy about one-half of the total cell area. The cells are furnished similarly to those in C Block.

A Block contains 111 cells of 64.5 square feet. The cell furnishings differ from those in the other blocks only in that about 90 of the cells contain double bunk beds.

The total single-cell capacity of OSP is 1107. On October 22, 1982, OSP held about 1520 men.[6] In addition, the facility has 46 cells of 48 square feet each in the Psychiatric Security Unit, 90 cells in the Segregation Unit, 30 of which are double-bunked, and 21 beds in the infirmary.

OSCI is designed generally for youthful first-offenders convicted of less serious offenses. Or.Rev.Stat. § 421.710(1) (1981). The facility was built in 1959 and is in excellent repair. There are five cell blocks. Unit 1 has 64 cells of 51.3 square feet each; Unit 2, 63 cells of 51.3 square feet; Unit 3, 67 cells of 67.8 square feet; Unit 4, 101 cells of 65 square feet; and Unit 11, 101 cells of 51.9 square feet. Unit 13 is a 3732-square-foot dormitory originally designed to hold 80 beds. The design capacity is thus 476. On October 22, 1982, the count was 1031. In addition to these cells, 48 cells of 51.9

square feet are contained in Unit 5, the disciplinary unit, and 10 beds are provided in the infirmary.

The Farm Annex is a 2089 acre dairy farm for prisoners requiring only minimum custody. It was originally designed to house about 125 prisoners in two floors of open dormitories. The current population is about 200 men.

**B. General Considerations: The Analytic Framework**

■ To the extent prison conditions are restrictive and even harsh, they are part of the penalty criminals must pay for their offenses against society.[7] *Chapman,* 452 U.S. at 347, 101 S.Ct. at 2399. However, the eighth amendment protects inmates from an environment in which degeneration is probable and self improvement unlikely because of conditions that inflict needless physical or mental suffering. *Battle v. Anderson,* 564 F.2d 388, 393 (10th Cir.1977).

■ To live in fear for one's life, to suffer neglect such as bad food and poor medical care not only unnecessarily inflict pain but are bad penology. If prison exacerbates an inmate's bottled anger, society pays the price when, with freedom, that bottle is uncorked and the anger issues forth. However, a condition that makes little penological sense is not for that reason unconstitutional. The eighth amendment does not require sound penology; rather, it proscribes the wanton infliction of pain.

Oregon's prisons are badly overcrowded. The conditions that existed in 1980 exist to this day:

The evidence in this case . . . is replete with examples of the deleterious effects of overcrowding on prisoners' mental and physical health. Inmates have increased health risks, diminished access to essen-

---

**6.** Numbers are ever changing. As used here, they are "in-count," meaning those physically present on any given day. "Out-count" includes those who are, for example, out for a court date, on escape status, on furlough or work release, and the like. The specific count

for the various institutions is found in the Appendix.

**7.** "[N]obody promised them a rose garden; ..." *Atiyeh v. Capps,* 449 U.S. at 1312, 1315–16, 101 S.Ct. 829, 831, 66 L.Ed.2d 785 (1981).

tial services, fewer opportunities to engage in rehabilitative programs, too little of the privacy and quiet essential for psychological well being and too much exposure to other prisoners in confined spaces. Overcrowding has resulted in a climate of tension, anxiety and fear among both inmates and staff—which, if not corrected, may well erupt in violence, leading to serious physical harm and death.

*Capps/West I,* 495 F.Supp. at 814.

As a system, the Oregon prisons house over 2700 inmates in institutions designed to hold only 1700. Inmates have between 24.6 and 56.1 square feet of living space. The vast majority of inmates at OSP, OSCI, and the Annex live in quarters smaller than those recommended by the National Sheriff's Association (70 to 80 square feet), the American Public Health Association (60), the American Correctional Association (60), and even the U.S. Army (55). But that does not mean the conditions of confinement are below the constitutional minima. "[O]pinions of experts as to desirable prison conditions [do not] suffice to establish contemporary standards of decency" embodied in the eighth amendment. *Chapman,* 452 U.S. at 348 n. 13, 101 S.Ct. at 2399–40 n. 13.

In *Chapman,* the Supreme Court held that (1) a population beyond design capacity, (2) cell space of less than fifty square feet per inmate, and (3) double-celling do not of themselves constitute cruel and unusual punishment. However, in *Chapman,* the double-celling "did not lead to deprivation of essential food, medical care, or sanitation. Nor did it increase violation among inmates or create other conditions intolerable for prison confinement." 452 U.S. at 348, 101 S.Ct. at 2399. The Court, therefore, recognized that while overcrowding itself is not a violation of the eighth amendment, overcrowding contributes to the effect of every deficiency in the prisons' operations. *Hoptowit,* 682 F.2d at 1249. Overcrowding may cause increased violence, or it may dilute other constitutionally required services so they fall below the minimum eighth amendment standards. For instance, overcrowding may reach a level at which the shelter of the inmates is unfit for human habitation. At some point, "population itself becomes an unnecessary or wanton infliction of pain." *Id.*

 I may remedy only the specific conditions that violate the constitution. *Id.* at 1247. A remedy may go beyond this only when there is a record of past constitutional violations and violations of past orders. *See Hutto v. Finney,* 437 U.S. 678, 687, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978). In ordering a remedy, I must consider the cost of compliance and the effect on the legitimate security needs of the prison. *Hoptowit,* 682 F.2d at 1247; *Wright,* 642 F.2d at 1134. I should defer to the policy choices made by prison officials and order a remedy consistent with the basic approach taken by the officials unless that approach is inconsistent with the eighth amendment. 682 F.2d at 1247. My task is limited to enforcing constitutional standards and does not embrace superintending prison administration.[8] *Ruiz,* 679 F.2d at 1126.

With these considerations in mind, I turn to the specific challenged conditions.[9]

---

8. No one familiar with this litigation could correctly suggest that this court has been overeager to usurp the task of running Oregon's prisons. *Cf. Atiyeh v. Capps,* 449 U.S. at 1316, 101 S.Ct. at 831. On a number of occasions, this court has made its resources available to encourage a negotiated settlement rather than the resort to protracted litigation. *Cf. Stanwood v. Green,* No. 72–981 (consent decree filed March 12, 1982; Coos County, Oregon jails); *Roberts v. Speelman,* No. 81–6096 (consent decree filed July 21, 1981; Baker County, Oregon jails). And in these cases, plus their predecessors, *Allen v. Hammond,* No. 77–1030 and *Nims v. Sullivan,* No. 77–1031, I arranged for Mr. Alan Breed, Director of the National Institute for Corrections, to come to Oregon for serious and wide-ranging settlement discussions. While I was not privy to the discussions themselves, it is no secret that a settlement very nearly came about. Unfortunately, due to circumstances beyond the control of those living in and operating the prisons, these efforts were to no avail.

9. Perhaps this is all an exercise in futility. As Mr. Charles E. Fenton, Jr., one of the States correction experts, put it:

Prison doesn't impact crime. You don't have professional criminals in prison. You

## III. SPECIFIC CONDITIONS CHALLENGED BY INMATES

### A. *Violence and Guard Behavior*

1. *Violence.* An inmate has a right to be incarcerated in a reasonably safe environment. Prison officials have a duty to take reasonable steps to protect inmates from physical abuse. An inmate need not be assaulted to obtain relief. This right includes being protected from constant threats of assaults from other inmates. *Hoptowit,* 682 F.2d at 1250; *Ramos v. Lamm,* 639 F.2d 559, 572 (10th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Stickney v. List,* 519 F.Supp. 617 at 620 (D.Nev.1982). Prison officials need not (because they cannot) eradicate prison violence but they must control it to a significant degree. Of course, I must view the degree to which prison officials control violence in light of the fact that prisons are:

> a closely, tightly controlled environment peopled by those who have chosen to violate the criminal law and have been lawfully incarcerated for doing so. Some are first offenders, but many are recidivists who have repeatedly employed illegal and often very violent means to attain their ends. They may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe prison life.

*Wolff v. McDonnell,* 418 U.S. 539, 561–62, 94 S.Ct. 2963, 2977–78, 41 L.Ed.2d 935 (1974).

The question before me is whether there exists a deliberate indifference to the legitimate safety needs of the inmates. The State contends, and I find, that its corrections officials react swiftly and severely to every act of violence they see. But this alone does not mean the State has taken and is taking reasonable steps to protect the inmates. The State is deliberately indifferent to inmate safety if it crowds more inmates into an institution than it can adequately supervise. Consequently, a court may require prison officials to maintain a sufficient number of guards to prevent not just punish assaults. *Hoptowit,* 682 F.2d at 1251.

Experts expect overcrowding to result in violence. Overcrowding is a catalyst of a general breakdown in discipline and thus promotes inmate violence. But for me to grant the inmates relief from their crowded conditions, the inmates must establish that the expected occurs. For me to reduce overcrowding, violence must be out of proportion to the increase in population. *Hoptowit,* 682 F.2d at 1249. The inmates, on this record, have not met this burden. The record fails to establish that these dire predictions have become true. *See Smith,* 690 F.2d at 125.

Before and during the pendency of this case, the prison population has grown dramatically. During this period there has been one riot at OSP, two sit-down strikes at OSCI, and an increasing number of stabbings, assaults, and disciplinary infractions. Inmates testified that assaults had increased with prison crowding. Charles Sloan, for example, testified that fights and assaults are common at OSP; in the early 1970's when OSP housed far fewer inmates, violence was almost nonexistent. Other inmates who had been at OSP when the population was considerably smaller confirmed Mr. Sloan's testimony.

have professional prison[ers] in prison. Professional criminals are out on the street stealing, in fact, some of them run for office. How we deal with prisoners does not impact crime to any significant degree. Crime is impacted by public expectations, and public expectations are reflected much more effectively through the media than the bench or decisions of a warden here and there.

Compare Mr. Fenton's assessment with that of Judge Doyle in *Morales v. Schmidt,* 340 F.Supp. 544, 548–49 (W.D.Wis.1972), rev'd, 489 F.2d 1335 (7th Cir.1973), *remanded on rehearing,* 494 F.2d 85 (7th Cir.1974) (en banc):

> With respect to the intrinsic importance of the challenges, I am persuaded that the institution of prison probably must end. In many respects it is as intolerable within the United States as was the institution of slavery, equally brutalizing to all involved, equally toxic to the social system, equally subversive of the brotherhood of man, even more costly by some standards, and probably less rational.

Inmates at all three facilities described repeated incidents of violence. Because of the level of violence in the prisons, inmates testified they fear for their safety. Inmates testified there are parts of the prison that are unsafe and that there are too few officers to supervise all activities and areas. Some inmates, because of their fear of violence, spend much of the day in their cells.

Prison officials deny that the level of violence is shown to be unacceptable, noting that only one inmate has been murdered in an Oregon prison in the past three years. The fortuity of this relative nonoccurrence does not mean an atmosphere of fear, anger, and frustration does not exist. As the prison populations have grown, so have serious acts of violence. Inmates have been fire-bombed and burned, assaulted with mop ringers, beaten with cue sticks, and stabbed with an assortment of implements.

The superintendents' monthly reports document the increase in tension and violence. In his January 1981 report, Superintendent George Sullivan notes OSCI's population is 574. His discussion of Chronic Problems reads in full: "Nothing to Report." In February 1981, Justice Rehnquist stayed my remedial order and the population began to rise. In his June 1981 report, Mr. Sullivan states: "as our population is going up, tension is building .... During the month we had 9 inmate on inmate assaults. One ... had severe racial tones ...." In March 1982: "Several inmates have reported undetected fights and assaults are increasing. Also, they indicate with the young verbally-abusive inmates we have and the 'hot heads' who don't care, it's becoming a very hostile atmosphere." The August 1982 report contains a twelve-page addendum discussing chronic problems and unusual incidents at OSCI. These problems include assaults, fights, self-mutilations, and group disturbances. The population at that time was 970, and since has soared to over 1000, at one point reaching 1036. Superintendent Hoyt Cupp's monthly reports for OSP and the Annex contain similar observations and echo like concerns.

As the prison population rose, the 1981 Legislature diluted the ability of prison officials to provide for the personal safety of Oregon's inmates. Budget cuts cost OSCI twelve correctional officers. The institution has fewer guards now than it did when it held only 550 inmates. Only one security officer is assigned to each of the housing units, with the exception of Unit 5, the segregation unit. In the case of Unit 13, this means one officer guards over 100 men. Staff levels are so low that if more than one officer is needed to take a disruptive inmate to segregation, the extra officer must leave his living unit unattended. OSP suffered similar losses in 1981, losing eighteen positions to the budget axe.

Even the State's corrections experts, Charles E. Fenton, Jr., formerly the warden of the maximum custody federal penitentiary at Marion, Illinois, and George W. Sumner, currently warden of the Nevada State Prison and formerly the warden of the California State Prison at San Quentin, agreed that OSCI is badly overcrowded and understaffed. Given the increase in population without a concomitant increase in staff, it is inevitable that some violence will occur because there are too few officers to observe and protect too many inmates.

The question remains whether the level of violence on this record is so high as to warrant the inference that the State is deliberately indifferent to the inmates' safety. Though it is a close call, particularly at OSCI, on this record, I am unable to conclude that deliberate indifference has been shown. As bad as conditions may be in the abstract and in comparison to earlier years, the level of violence is not quite yet impermissibly high. Mr. Fenton and Mr. Sumner both testified that compared to other similar institutions, Oregon's prisons were relatively free of tension. For example, in the two years preceding the district court's opinion on conditions in the Washington State Penitentiary in Walla Walla, eight inmates and two guards were killed, and prison officials imposed three lock downs to curb violence. *Hoptowit*, 682 F.2d at 1249.

It is difficult to know how much to credit the State's experts' findings of a relative lack of tension. In January 1982, twenty-three state corrections agencies were under court-ordered population limits. Four other agencies had court-appointed monitors during 1981. The Corrections Yearbook 23–24 (CJI 1981). The inmates' corrections expert, Mr. Gordon Kamka, formerly Maryland's Secretary for Public Safety and Correctional Services and warden of the Baltimore City Jail, testified that he found quite a high level of tension. I give greater weight to the State's experts testimony because Mr. Fenton and Mr. Sumner have had more experience than Mr. Kamka in administering institutions of the type at issue here. The State's experts testified, without successful refutation by the inmates, that a number of the warning signs of an imminent outbreak of violence are missing: inmates are not huddling for safety and posting outlooks, and inmates have not converted many accessible items into weapons.

The inmates have tried to show through statistical analysis that incidents of violence at the institutions are out of proportion to the increase in population, while the State offers statistics to refute the inmates' claim and to establish that population increases have not produced increased violence. Even if the statistics established that incidents of violence have risen faster than the population, this indicates only that violence is a function of population. It does not by itself show that the level of violence is so high that it actually or inevitably inflicts pain. *See Hoptowit,* 682 F.2d at 1249.

Regardless of the conclusion to be drawn from the statistics, the inmates have not yet established the validity of their premise: that violence is out of proportion to the population. The danger of statistical evidence is that the sample necessarily affects the conclusion to be drawn from it. Viewing only the period from my 1980 remedial order to the present, charges of disciplinary rule violations do appear to be increasing at a greater rate than the population. However, if one considers the whole of the previous five years, the probability on a per capita basis of being involved in any kind of

reported violence was greater with decreased population. In addition, even assuming these statistics proved an increase in charges over population, the inmates have not shown the increases reflect a change in inmate behavior rather than in administrative policy.

What the record does show is that the current level of violence is so high that the State may soon fail in its constitutional duty to protect the prisoners from harm, particularly at OSCI. Just as I credit the State's experts' assessment of the current level of violence, I give great weight to their opinions as to the consequences of future population increases. According to Mr. Sumner, the inmates at OSCI "are extremely volatile and quite capable of changing, causing an erruption [sic] of the whole institution over a minor incident. Inmates of this age are more verbal and quick to react." Because OSCI has so few jobs and thus too many idle hands (and bodies), Mr. Sumner found OSCI's present population to be at the breaking point. Mr. Fenton testified that OSCI was at the end of its ability to segregate disruptive inmates. Without the ability to remove behavior problems from the main population, OSCI, as would any prison, stands a good chance of disintegrating into violence. Because OSP has the prison industries, Mr. Fenton testified OSP could absorb another one hundred to two hundred inmates before the staff would be unable to ensure the inmates' safety. Mr. Sumner put an upward limit on new inmates at OSP at two or three hundred. Accordingly, if, despite the admonitions of its own corrections experts, the State houses still more prisoners at OSCI or does more than its current plan to double-up sub-C Block and the medical cells in A-Block at OSP, it should be an easy matter for the inmates to establish that the State no longer affords them their constitutionally-required protection, that is, reasonably adequate safety. At that point, the inmates in all likelihood would be entitled to a remedial order reducing the guard to inmate ratio,

or making other changes to reduce the level of violence.[10]

 2. *Guard Behavior.* A court may order prison officials to protect inmates from guards. *Hoptowit,* 682 F.2d at 1251. Prison guards can use only the degree of force needed in each situation. *See Spain v. Procunier,* 600 F.2d 189, 195 (9th Cir.1979).

 On two occasions, every inmate on the first tier of the OSP segregation unit was stripped and left without clothing or bedding from dinnertime until after breakfast the next day. Inmates have also been held overnight without clothing in isolation rooms and in the side rooms at the Psychiatric Security Unit. OSP inmates testified about beatings by guards and the random use of mace. Inmates at OSCI also testified about beatings by guards. However, the inmates have not shown a pattern and practice of brutality and harassment by the guards in the main populations or in the segregation units.

Violence of every kind is to be deplored. But in each specified instance in which a staff member allegedly used excessive force to subdue a prisoner, I find the staff response to have been measured and appropriate under the circumstances. *Cf. Albers v. Whitley,* 546 F.Supp. 726 (D.Or.1982). The inmate witnesses themselves admit that at the time the guards allegedly used excess force, the inmates were threatening the order and security of the institution.

## B. *Segregation and Isolation*

 Segregated confinement and its inescapable accompaniments—isolation from companionship, restriction of intellectual stimulation, and prolonged inactivity—do not in themselves amount to cruel and unusual punishment, even if for a prolonged duration. The inmates in disciplinary segregation are there because they have shown themselves to be incapable of behaving even in the controlled environment of the main prison population.

 But the basic elements of a safe, healthful, and sanitary environment may not be withdrawn for any appreciable length of time as a method of prison discipline. In this regard, the eighth amendment standards for conditions in isolation and segregation are no different from standards applying to the general population. *Hoptowit,* 682 F.2d at 1258. According to this standard, the inmates have not established that any condition in the segregation unit falls below the constitutional minimum independent of those I will identify pertaining to the institutions as a whole.

The plaintiffs raise three issues ostensibly unique to segregated inmates:

1. Segregated inmates are denied adequate exercise;

2. Segregated inmates are double-celled; and

3. Sanctions are too long.

 1. *Exercise.* When inmates are first confined in segregation at OSP, they are allowed thirty minutes outside of their cells each day. The inmates use this time to exercise, shower, shave, and to exchange books; actual time for exercise may be only

---

**10.** The inmates also contend the State incarcerates them in an environment so violent that it violates Or.Rev.Stat. §§ 421.016(4), 421.105 (1981).

Section 421.016(4) provides in pertinent part: "The superintendents: (a) Shall keep all inmates safely, according to the law and the rules of the Corrections Division."

Section 421.105 provides in pertinent part: "(1) The superintendents may enforce obedience to the rules for the government of inmates in the institution under his supervision by appropriate punishment but neither the superintendent nor any other prison official or employee may strike or inflict physical violence except in self-defense, or inflict any cruel or unusual punishment.

(2) [An inmate] ... shall not be injured except as authorized by law."

These provisions have been used to challenge the existence and harshness of disciplinary rules and punishments. *See Grenfell v. Gladden,* 241 Or. 190, 405 P.2d 532 (1965); *Bekins v. Cupp,* 21 Or.App. 16, 533 P.2d 817 (1975); *Curtis v. OSCI,* 20 Or.App. 530, 532 P.2d 798 (1975). I see no basis for concluding they provide a substantive standard independent of the eighth amendment against which a court can measure the superintendents' efforts to protect inmates from assault.

ten minutes. After forty-five days, inmates may exercise out-of-doors for one hour a day, five days a week, weather permitting. Inmates at OSCI receive thirty minute walks on the tiers after eight days and one hour outside after fifteen days. Inmates may lose the privilege of exercising outside if they break more rules.

The inmates contend that all inmates who have been in segregation for more than seven days should be afforded the opportunity for regular outdoor exercise. They also want me to place constraints on the staff's ability to restrict exercise privileges for further rules violations. If I were the superintendent, I would surely change such harsh rules, especially for those inmates who are double-celled. But, unfortunately for the inmates in the segregation units— and perhaps, fortunately for me—my only concern is whether the State is furnishing the inmates with adequate food, clothing, shelter, sanitation, medical care, and personal safety. *Id.* In this regard, the inmates have failed to prove that they are or inevitably will be denied one of these basic needs because of their lack of outdoor exercise for forty-five days. After *Hoptowit*, I cannot do as the inmates invite me to and consider the size of their cells, the time they spend in their cells each day, and the length of their confinement. *Cf. Spain,* 600 F.2d at 199–200. Under these circumstances, the question becomes one of prison management, to which the State is entitled great deference in adopting and implementing policies and practices to maintain institutional security. *Bell v. Wolfish,* 441 U.S. at 547, 99 S.Ct. at 1878.

■ 2. *Double-celling.* The segregation and isolation (S & I) unit at OSP has 90 cells, 30 of which are double-bunked. Thus, if 120 inmates are in S & I, 60 are in double cells and the other 60 are in single cells. The figures in the margin indicate that the numbers recently have been less than 120, though the record indicates that, on occasion, there have been times when nearly all cells are filled to capacity; that is, 60 single cells and 60 in the 30 double cells. As in the main prison population, this double-cell-

ing is not of itself cruel and unusual punishment. Double-celling in disciplinary confinement to a great extent defeats the purpose of segregation, but that does not make it unconstitutional. The psychological and physical effects of segregation are doubtlessly compounded when inmates are crowded into small cells. But there is not enough evidence in the record for me to find that the double-celling in segregation denies the inmates any of life's basic needs.

■ 3. *Lengthy sanctions.* Many inmates at OSP spend months and even years in segregated confinement. Between January 1, 1981 and June 30, 1982, 38 inmates were sanctioned to confinement for three to six months, 51 were sanctioned to a year or more. The inmates ask me to limit the maximum term of confinement to three months.

Sanctions at OSP are indeed long when compared to those imposed in other prison systems. Under the Federal Bureau of Prison rules, disciplinary confinement cannot be for more than sixty days. 28 C.F.R. § 541.11. A.C.A. Standard 2–4354 limits a maximum sanction for a rule violation to fifteen days, thirty days for multiple violations in one incident.

■ As a general rule, a challenge to the length of disciplinary confinement is not a proper subject of a prison conditions suit. All that is required is that the punishment not be disparate to the severity of the offense. *See Trop v. Dulles,* 356 U.S. 86, 100, 78 S.Ct. 590, 597–98, 2 L.Ed.2d 630 (1958) (plurality opinion). Based on this criterion, all of the challenged sanctions are constitutional.

The length of confinement is only a factor for me to consider in determining whether the State denies the inmates' basic needs. A forced stay in unsanitary conditions for a day may not amount to cruel and unusual punishment; however, if an inmate lives in squalor for four and a half years, a court could more readily conclude the State has deprived the inmate of a basic need. *Compare Hayward v. Procunier,* 629 F.2d 599, 603 (9th Cir.1980), *cert. denied,* 451 U.S.

937, 101 S.Ct. 2015, 68 L.Ed.2d 323 (1981) *with Spain,* 600 F.2d at 199.

In theory, I could reduce the length of a sanction so that the inmate is not deprived of a basic need for a constitutionally impermissible period. But the inmates must first establish the predicate: that the State presently deprives them "of the minimal civilized measures of life's necessities." *Chapman,* 452 U.S. at 347, 101 S.Ct. at 2399. As I discussed above, there is not sufficient evidence for me to conclude that the segregated inmates are, for constitutional purposes, any worse off than the main prison population.

### C. Idleness/Classification

 1. *Idleness.* Idleness caused by the lack of jobs and educational opportunities is not an eighth amendment violation. *Hoptowit,* 682 F.2d at 1254. Likewise, that existing programs are inadequate to serve any rehabilitative purpose does not violate the constitution. Prisoners have no enforceable constitutional right to rehabilitative programs. *Id.* at 1254–55; *Kent v. Cupp,* 26 Or.App. 799, 802–03, 554 P.2d 196, 197–98 (1967) (Or. Const. art. I, § 15 "is significant as a hortative philosophical base for Oregon's penal code and correctional programs."). OSCI inmates fare no better by citing Or.Rev.Stat. § 421.710 (1981). Section 421.710 reads in full:

(1) The principal objectives of the Oregon State Correctional Institution are to provide for the discipline, correction and rehabilitation of male persons convicted of a crime who, because of their experience in crime or delinquency, are not eligible for commitment to or would be serious disciplinary or security risks at the MacLaren School for Boys but who are considered amenable to rehabilitation and do not require a sentence imposing a punishment of imprisonment in the Oregon State Penitentiary.

(2) Primary emphasis shall be placed upon the rehabilitation of persons committed to the institution. Restoration to useful citizenship shall be the principal aim of the institution.

(3) The superintendent of the institution and his subordinate officers and employees shall use their best and consistent endeavors to bring about rehabilitation and restoration through a program of work, education, guidance and discipline so that the inmates are trained and developed to become useful and honorable members of society and that they will be encouraged to live a law abiding existence upon their release.

 Subsections (1) and (2) explain the nature of the institution and state the institution's general goals. A goal is just that. Failure to meet a goal does not, without more, mean the violation of a statutory or constitutional standard for which a judicially enforceable order will issue. Subsection (3) is directed to the superintendent and his staff, not to the State. Within the limits imposed upon them by their meager budget, Superintendent Sullivan and his staff have done an outstanding job ameliorating the effects of overcrowding. To borrow a line from Mr. Fenton: "There is no question in my mind but what lesser management skills would have already been overtaxed by the population levels." [11]

---

11. In this vein, I add these comments:

Unfortunately, the phrase "deliberate indifference" conjures up images of a sort of penal Dickensian ogre. But, as we are taught by *Spain,* 600 F.2d at 197, "wrongful intent is not a necessary element of an eighth amendment violation." I do not mean to suggest that Director Watson and Superintendents Cupp and Sullivan are anything other than decent and able people. Indeed, Watson is an unusually able administrator and Cupp and Watson, as wardens, are skilled, humane, and realistic. But none of these gentlemen is a magician. In general, the executive and legislative branches—mirroring what is seen as a combination of public apathy and citizens' mood of getting "tough on crime and criminals"—have waffled on or largely ignored the needs of prisons. If this produces only harshness, my writ will not reign. If the end product is a denial of one of the six basic needs, the constitution compels, not merely allows, my writ to issue.

Many observers have noted that it is a sad commentary on the priorities of Oregonians that some prison conditions are unconstitutional in spite of the best efforts of able prison administrators. But the same public that insists judges and parole board members jail

Idleness among inmates, however, may lead to frustration, anger, and eventually, violence. If this level of violence were excessive—which, on this record, it is not—I could remedy the situation by reducing the population of idle inmates. To reduce idleness, I could require the State to implement additional vocational and educational programs or to reduce the prison population to a level where all inmates desiring to enroll in these programs may do so.

Even if I had found on this record that OSP is unconstitutionally unsafe, idleness is not a serious problem at OSP and the Annex. While the inmates testified to large numbers of idle inmates, the State presented credible evidence, which I accept as established, that nearly any inmate wishing a job is assigned to one. The State's experts testified that the OSP and Annex work details were not padded.

OSCI is another matter entirely. As Mr. Sumner testified, the inmates at OSCI are volatile and quick to react. Idleness, therefore, is more dangerous at OSCI than it is at OSP or at the Annex. Nonetheless, recent staff reduction at OSCI have, in relative terms, decimated its educational, vocational, and recreational programs. OSCI has fewer instructors now than it did five years ago when the population was only half that which it is today. For a great number of the OSCI inmates, all that is left is to sit and watch television. Superintendent Sullivan reports that over half of the inmates are in their cells during morning count. This idleness is a significant cause of the tension at OSCI and borders on penological lunacy. However, because on this record the tension and consequent violence do not yet exceed constitutionally permissible levels, I cannot order a reduction in OSCI's idle population.

■ 2. *Classification.* Intermingling of incompatible inmates results in the victimization of the "young, passive, or weak" by those "stronger and more aggressive." *Pugh v. Locke,* 406 F.Supp. 318, 324 (M.D. Ala.1976). This, in turn, leads to violent confrontations.

Nearly all of the prisoners live in severely crowded dormitories or two to a cell. However, there are too few staff members to adequately classify inmates. In the past, the State would send first time offenders under the age of 26, whose crimes did not involve an assaultive rape or murder, to OSCI. This distinction has largely collapsed with crowding. There is now little difference, except age, between the inmates at OSCI and OSP. Even within the institutions, there is little attempt to separate inmates by crime or violent behavior. Dangerous offenders are put with the non-dangerous. Misclassification thus contributes to the potential for violence. But, like idleness, misclassification itself is not a constitutional violation. *Hoptowit,* 682 F.2d at 1256.

If the State were deliberately indifferent to the inmates' safety, I could require more exact classification and physical separation of incompatible inmates as "one of the cheapest ways to achieve a measure of security." *Palmigiano v. Garrahy,* 443 F.Supp. 956, 966 (D.R.I.1977), *remanded,* 599 F.2d 17 (1st Cir.1979). This would heed *Hoptowit's* admonition to consider the cost to the State of any remedial order.

criminals for ever longer periods also refuses to pay for the inevitable side-effect: more prisoners. In 1981, the state legislature proposed to build a new prison. In the May 1982 primary election, the voters rejected (as they had done in November 1980) the bond measure that would have financed the construction of the new facility. According to The Corrections Yearbook 19–20 (CJI 1982), Oregon is the only state in the Union to have no new prison facilities under construction and none planned. Oregonians cannot have their cake and eat it too. There is nothing in the record to contradict the State's claim that their superintendents are the country's finest. Like Sisyphus, the Corrections Division administrator and superintendents toil to control their rising populations only to watch their work undone by political forces. As the population at OSCI climbed toward the 1000 mark in 1982, the Corrections Division opened a minimum security forest camp at Bear Flat in the Klamath Falls area. The camp was to house 100 inmates. However, the few area residents objected to having the inmates as their neighbors. Their complaints reached receptive ears in Salem and the camp is now closed.

### D. *Medical Care.*

■ Prison officials must provide inmates with a system of ready access to adequate medical care. *Hoptowit,* 682 F.2d at 1246, 1253. The denial of medical care, whether intentionally or through deliberate indifference, is cruel and unusual punishment. In the worst case, it can result in physical torture and, even in less serious cases, it can result in pain without a penological purpose. *Gamble,* 429 U.S. at 103–04, 97 S.Ct. at 290–91.

■ The State's obligation is three-fold. First, prisoners must be able to make their medical problems known to the medical staff. Second, the medical staff must be competent to examine inmates and to diagnose their illnesses. Third, the staff must be able to treat the inmates' medical problems or to refer the inmates to outside medical sources who can. *Hoptowit,* 682 F.2d at 1253.

■ To show the State fails to fulfill one of these obligations, the inmates must demonstrate a pattern of suffering sufficient for me to presume that the prison administrators have, through their programs and procedures, created an environment in which negligence is unacceptably likely. *Robert E. v. Lane,* 530 F.Supp. 930, 940 (N.D.Ill.1981). "And while a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment bespeak a deliberate indifference by prison authorities to the agony engendered by haphazard and ill-conceived procedures." *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977). Only when the inmates establish that the State is deliberately indifferent to their serious medical needs can I explore the root causes to fashion a remedy.

■ Before turning to the inmates' proof, I describe briefly the operation of the medical services at OSP.[12] The medical facilities at OSP consist of the following: (1) a first aid room; (2) a doctor's office; (3) a laboratory; (4) a records and administration office; (5) a surgical and scrub room; (6) a pharmacy; (7) X-ray facilities; (8) a 21-bed infirmary; and (9) a physical therapy room.

The medical facilities at OSP are staffed by three part-time physicians, five full-time nurses, seven full-time medical technicians (medtechs), one full-time licensed pharmacist, and one full-time infirmary manager. Ten inmates work part-time doing custodial chores. Additionally, the State provides medical services outside OSP through private specialists and hospitals, the University of Oregon Health Sciences Center in Portland, and the BBV Medical Services, Inc. The medical staff at OSP provides medical services for the inmates at the Annex.

Dr. DiIaconi, the Chief Medical Officer, is at OSP four mornings a week for two to three hours each morning. During that period, Dr. DiIaconi sees from thirty to thirty-five patients and makes rounds of the infirmary. Dr. DiIaconi also examines twenty-five to forty new prison admittees each week. Dr. Mead works twenty to twenty-two hours each week at OSP, including one morning a week in the segregation and isolation unit. Dr. Becker, an orthopedic specialist who devotes most of his time to OSCI, is also available four hours per week. The doctors providing general medical services are regularly at OSP only in the morning. There is no doctor at OSP during the afternoon, evening, or weekend. Dr. DiIaconi is on call round-the-clock. However, it appears he rarely comes to the prison after hours.

During the week, OSP and the Annex provide a daily sick call line. During sick call, an inmate reports to a medical technician (or occasionally to a nurse) to advise the medical staff that he is sick or injured. The medtechs generally have military corpsmen training but are not licensed by

---

**12.** An enormous amount of evidence, both documentary and testimonial, exists in the record regarding the numbers of inmates treated through the medical delivery system and the nature of the treatment provided. I cannot detail it in this opinion without unduly prolonging its issuance.

any regulating agency. The medtech inquires of the nature of the inmate's malady. The medtech can dispense pharmaceuticals or, if there appears to be a need for immediate diagnosis or treatment, the medtech can send the inmate to the infirmary to see the doctor. If the illness or injury is not serious, the medtech places the inmate's name on a doctor's appointment list. This process generally results in a one to three day delay before the inmate is seen by the infirmary staff.

Inmates who become injured or ill after hours or on the weekend report to the officers on duty who are to relay the complaint to the medical staff. The nurse or medical technician then determines from the information provided whether the inmate should be brought to the infirmary.

On behalf of the inmates, Dr. Richard Della Penna, a nationally-recognized expert in the delivery of prison health care, evaluated the performance of the OSP medical staff. Dr. Della Penna examined, by his estimate, forty to fifty inmate medical files. Dr. Della Penna selected the files of those inmates who had died recently, those who had testified in this case, and those who were on the ward during his visit to OSP. He also examined twenty outpatient files that the OSP medical staff supplied to him on a random basis.

At trial, Dr. Della Penna testified in great detail to the suffering and exacerbated injury caused by the lack of and mistaken diagnoses and treatments in three specific cases. He also supplied the court with his detailed comments on the medical care received by fifteen other inmates. While he was critical of the staff's performance in each of these cases, the errors in eight of the cases were so egregious that the inmates suffered needless pain and injury.

These errors were not in treatment, such as a dropped stitch or misplastered cast. They amounted to misdiagnoses that delayed proper and, in some cases, any treatment.[13] Dr. Della Penna was of the opinion that no reasonable doctor, or nurse supervised adequately by a doctor, could have made the mistakes he found.

The State's medical expert, Dr. George Osborne of Oral Roberts University, reviewed the same inmate files as did Dr. Della Penna. Dr. Osborne concluded that the staff's errors, if any, were within the range of medical competency. To the extent that these conflicting opinions require me to assess the credibility and credentials of the witnesses, I give greater weight to the testimony of Dr. Della Penna. While Dr. Osborne may be a fine physician, he does not have Dr. Della Penna's expertise in the provision of prison medical services.

I find that the medical records the experts reviewed represent the medical treatment provided the plaintiff class as a whole. *Todaro*, 565 F.2d at 51–52; *Robert E.*, 530 F.Supp. at 940. The delayed and mistaken diagnoses found in this sample demonstrate that "systematic deficiencies in staffing, facilities or procedures make unnecessary suffering inevitable." *Todaro*, 565 F.2d at 52. Therefore, I must look to see what aspects of the staffing, facilities, or procedures the State must cure to bring OSP medical care above the constitutional minimum.

Dr. Della Penna believed the following deficiencies accounted for the staff's inability to provide adequate medical care:

(1) There are insufficient numbers of properly trained medical staff;

(2) Medical staff act beyond their roles and formal training;

13. These cases are the following:
1. W. Higginbotham (delay in treating endarerectomy);
2. D. Bankston (delay in diagnosing hip fracture);
3. A. Funderberg (delay in diagnosing and treating ailment not ascertained before his death;
4. M. Frost (delay in diagnosing and treating tuberculosis);
5. R. Wampler (delay in diagnosing and treating amorasis fugax);
6. F. Hinton (delay in diagnosing foot and facial injuries);
7. W. Thackery (delay in diagnosing and treating amorasis fugax); and
8. W. Brown (delay in diagnosing collapsed lung).

(3) The chief medical officer has not performed those functions necessary to his supervisory position;

(4) The prison infirmary is inadequately administered;

(5) Record keeping practices are poor;

(6) There is no chart review system;

(7) There is the lack of continuing education for staff, and meetings among staff; and

(8) There is no peer review.

Because I must respect the State's basic approach to providing medical services, *Hoptowit,* 682 F.2d at 1253–54, I will give the State ninety days to prepare and submit a plan to eliminate the systemic errors Dr. Della Penna found. This way, the State will have the first opportunity to tailor the remedial steps to their present provisionary plan. The State need not implement all of Dr. Della Penna's suggestions. For instance, I do not mean to intimate that peer review alone is a constitutional imperative. However, I do commend to the State the thrust of his comments. There is nothing wrong with the State using nurses and medical technicians as the primary or preliminary health care providers. The State need only look down the road to OSCI for an effective model.[14] The rub comes when the nurses and medical technicians are left to operate in a vacuum. They are inadequately supervised by Dr. Dilaconi (who understandably spends too much of his time treating patients to be an administrator) or

by written standing orders. Standing orders allow the medical staff to act in the doctor's absence. They describe symptoms and the appropriate treatments for them. While standing orders may not take the place of doctors, they do allow the nurses and medical technicians to assume the responsibility of a doctor in a limited way. While Dr. Della Penna recommended OSP hire a half-time physician supervisor, he also stated that this position could be phased out as the supervisor got the house in order.[15]

Because of the difficulty of evaluating and supervising the implementation of a detailed plan to eliminate unconstitutional conditions, I reserve jurisdiction to appoint a medical health expert as a special master or otherwise to monitor the State's compliance with this order. *Hoptowit,* 682 F.2d at 1263; *Ruiz,* 679 F.2d at 1159–61; *see generally,* Special Project, *The Remedial Process in Institutional Reform Litigation,* 78 Colum.L.Rev. 784, 807–08 (1978).

### E. Shelter and Sanitation/Physical Plant

 The inmates employed Mr. Samuel Hoover, an expert sanitarian from the Federal Bureau of Prisons, to inspect the facilities. Based on this report, the inmates believe the following public health violations threaten their well-being: (1) plumbing; (2) ventilation; (3) lighting; (4) food service; (5) fire safety; and (6) space.[16]

---

**14.** The inmates also challenged the provision of health care at OSCI. However, Dr. Della Penna found OSCI's medical corps to be understaffed but providing a level and quantity of care such that few inmates suffered. Accordingly, at the October 8, 1982 hearing, the inmates conceded the constitutional adequacy of the medical care service at OSCI. The principal reason OSCI's care is better than that at OSP is Dr. Becker, who not only actively supervises his staff but provides them with standing orders that allow them to operate efficiently in his absence.

**15.** The inmates listed many more "inadequacies" of OSP medical care. While I considered them all, I write only on those that merit a response.

The inmates spent considerable time objecting to the prison officials' housing healthy inmates at the infirmary. While no one condones this practice, least of all the OSP medical staff, it does not prevent sick inmates from receiving needed care, nor does it inflict pain on the healthy inmates.

**16.** Some of the prisoners complained about the issue of clean clothing. There are periodic shortages of various sizes of inmate clothing at OSP and the Annex. However, it does not appear that any of the inmates are going without adequate clothing cleaned on a fairly regular basis. Therefore, I find no constitutional violation.

There are apparently periodic shortages of items necessary for the inmates' maintenance of their personal hygiene. The inmates also

For each violation to amount to a deprivation of constitutional dimension, the inmates must establish not only that the deficient condition fails to meet public health standards but that the condition actually does or inevitably will inflict pain. I discuss the contentions in order.

1. *Plumbing.* At OSP, Mr. Hoover found sewage pipe leaks in the cell block pipe chases, living areas, and above clothing bins. These conditions have existed· for many years, indicating a lack of maintenance and an overtaxed system. Because the pipe chases are used as plenums to flow air through the cells, residual soil particles can be carried into the cells, there to be breathed by inmates. Mr. Hoover also found deteriorating walls, peeling paint, and leaking ceilings.

Even if OSP is filled with dripping pipes, puddles of sewage, and crumbling walls overlaid by a pervasive stench, the inmates have failed to show how this does or will cause them to be anything other than uncomfortable. The constitution prohibits pain not discomfort. The plumbing problems are most often caused by the inmates themselves placing bedding and clothing in the sewer system. The inmates cannot complain that the State inflicts pain by not adequately preventing them from causing their own discomfort.

The most serious health hazard Mr. Hoover noted was cross-connected pipes. If drinking water and sewer pipes are cross-connected, non-potable water can back up into the tap water. While this situation could lead ·to a serious health problem, the inmates presented no evidence that such an occurrence was inevitable or even likely. Therefore, I find no constitutional violation.

2. ·*Ventilation.* Proper ventilation helps to prevent accumulation of odors, smoke, dust, gasses, and other contaminants. Consequently, it helps to prevent the spread of disease. *See Ramos,* 639 F.2d at 569. Mr. Hoover found the airflow in all three institutions to be far below American Public Health Association standards. In some areas, he could find no detectable air flow. However, the inmates failed to tie this lack of constant air circulation to any actual or inevitable injury. Therefore, I find the State denies no basic need.

3. *Lighting.* According to Mr. Hoover, lighting at all three facilities does not meet the standards of the I.E.S. Lighting Handbook. While I may accept as a general proposition the notion that dim lighting leads to eye strain and fatigue, the inmates failed to show that the deficient lighting in these institutions actually or inevitably inflicts pain. Therefore, I find the State denies no basic need.

4. *Food Service.* Inmate witnesses complained about the food services, particularly about those at OSP and the Annex. Many of these complaints are of the sort one hears from soldiers, students, and others who dine in institutional facilities. That food is occasionally cold cosmetically unappetizing does not mean that it fails to meet constitutional standards. Mr. Hoover found many sanitation standard violations, including dirty utensils and pots, vermin, improper storage, and inadequate sanitizing equipment. Inmate testimony confirmed Mr. Hoover's findings. However, Mr. Hoover was unable to express whether these violations rendered the food unfit for human consumption. *Cf. West v. Lamb,* 497 F.Supp. 989, 1001 (D.Nev.1980). Therefore, the inmates have not shown by a preponderance of the credible evidence that the institutions' food services are below minimum constitutional standards. On the con-

believe the items they are supplied are of such low quality as to be of no use. In particular, the inmates in the segregation unit complained about their tooth powder and shampoo. I need not decide whether the State's deprivation of these hygiene items for a significant length of time might be a constitutional violation. The evidence shows the shortage periods were not long. And, there is simply insufficient evidence in the record for me to conclude that the inmates in segregation are being deprived of basic hygiene. Their items may not be good compared to those they could have if they were in the main population. But I cannot conclude that their items are useless. Therefore, I need not decide whether they are being deprived of a basic item for too long.

trary, there is no evidence the food is not nutritional. There is little evidence the food is not palatable.

■ Mr. Hoover did, on the other hand, note one food processing deficiency that the State must remedy. The dairy farm at the Annex supplies milk for the institutions. In June 1982, Mr. Eric Paulson, a state agriculture department inspector, found the Annex's pasteurization operation to be in violation of state law. Among other things, he found the thermometer did not work. This is a serious problem because in the pasteurizing process one heats milk to destroy micro-organisms and to prevent or arrest fermentation. Mr. Hoover inspected the operation in September and found the same violations. Mr. Hoover described the pasteurization operation as "absolutely and totally in serious non-compliance with acceptable milk sanitation standards." The State cannot ignore the orders of its own agriculture department inspector.

■ According to Or.Rev.Stat. § 179.-360(1), "Each superintendent shall: ... (c) Adopt sanitary measures for the health and comfort of the residents.

(d) Promote the mental, moral and physical welfare and development of the residents." I need not set the boundaries of this statute. For example, I express no opinion whether the superintendent has adopted sanitary measures or promoted the inmates' physical welfare within the meaning of subsections 179.360(1)(c) and (d) when conditions at his institution fall below American Public Health Association standards. It is sufficient for this issue to hold that the superintendent fails in his statutory duty to adopt sanitary measures and to promote the inmates' physical welfare when conditions or operations or both at the institution violate state sanitation laws. The Oregon Revised Statutes devote an entire chapter to the production and processing of dairy products. Or.Rev.Stat. § 621.005 *et seq.* (1981).

■ Even if the Annex's pasteurization operation were not in violation of state law, the eighth amendment would require the State to cure those aspects of the operation that make the milk non-potable. Inmates have a right to food served under conditions that do not present an immediate danger to the inmate who consumes it. Generally, a simple health code violation does not offend the constitution. *See Bell,* 441 U.S. at 543 n. 27, 99 S.Ct. at 1876 n. 27. But pasteurization is a scientific operation to ensure milk is potable. Non-potable milk is, by definition, not fit for human consumption. The State is deliberately indifferent to the inmates' health when it provides them with milk unfit for human consumption because it is inevitable some inmate—or many inmates—will become ill.

5. *Fire Safety.* Fire safety is a problem at all three facilities. The State Fire Marshal regularly cites OSP. All too often, the staff takes months, if not years, to correct the problem. The potential for death and injury is most serious at the Annex. On October 27, 1981, the Fire Marshal cited the Annex because it needs smoke detectors or a fire alarm system and an emergency exit on the north end of the building. In addition, the south emergency exit is locked and only a guard can unlock it. Even if the inmates could get out the locked door, the evacuation would be slow and dangerous because the ladder does not reach to the ground. The Marshal warned that a serious accident could occur because of the lack of unlocked emergency exits on both ends of the building. In a fire, inmates in the north end might be cut off from the center stairway or south emergency exit.

■ Because the Corrections Division did not have the money to bring the Annex up to code, the Fire Marshal, in his discretion, declined to prosecute and temporarily extended the Corrections Division's compliance until it could convince the legislature to give it the money to make the changes. Superintendent Cupp promised to give the matter top priority in his 1983–85 budget request. If the Corrections Division did not have the funds, the Marshal had little choice other than to extend the time for compliance. I am not similarly constrained. That the Marshal has extended the time for

the Corrections Division to bring the Annex into compliance with state safety laws does not change the fact that the Annex does not comply with these laws. Therefore, these conditions violate Or.Rev.Stat. § 179.-360(1)(c) and (d).

While the record contains no evidence of a death or serious injury at the Annex caused by fire or smoke inhalation, fire safety is so deficient there that should a fire break out "serious"—to use the Fire Marshal's term—injury is inevitable. The Annex is a very old structure. It is not a solid concrete complex like OSP and OSCI. *See Ruiz,* 679 F.2d at 1153. The inmates, many of whom are older, live in crowded dormitories. The recent jail fire in Biloxi, Mississippi, in which 29 inmates died, illustrates this danger. Because serious injury is inevitable, the deficiencies in fire safety at the Annex constitute cruel and unusual punishment. The State contends its security needs require it to lock the emergency door. To the extent that security concerns militate against the finding of unnecessary pain, I do not believe this excuse tips the scales in the State's favor. The Annex is a minimum security facility. The inmates roam the grounds with little, if any, supervision. Even Mr. Sumner, the State's corrections expert, recommended adding the second emergency exit.

In keeping with *Hoptowit*'s admonition to tailor the remedy as closely as possible to the wrong, I will allow the Corrections Division 60 days to work with the Fire Marshal to implement the spirit, if not the letter, of the October 27, 1981 order. If the Corrections Division can convince the Fire Marshal there are cheaper ways to achieve effective fire safety at the Annex than literal compliance with the fire safety code, it is free to do so. For example, Superintendent Cupp currently posts an inmate fire watch.

I express no opinion on whether that is as effective as a mechanical smoke detector. If, however, at the end of the 60 days, I have not received the Fire Marshal's assurance that the Annex is in substantial compliance with state fire safety laws, I will enter an appropriate order.[17]

6. *Space.* The individual space afforded inmates at all three facilities is severely limited. Crowding at the prisons taxes the plumbing system and the toilet and shower facilities. It reduces the effectiveness of the ventilation system, hindering air movement, temperature regulation, and the removal of contaminants. This, in turn, increases the potential for the spread of infectious diseases such as colds, flu, tuberculosis, and hepatitis.

Be this as it may, the simple lack of space does not inflict pain. *Chapman,* 452 U.S. at 348, 101 S.Ct. at 2399. To be entitled to relief, the inmates must establish, as they have attempted in the previous five categories, that this lack of space deprives them of basic shelter and sanitation needs. *Hoptowit,* 682 F.2d at 1247–49.

## SUMMARY

For the reasons set forth above, and based on the entire record, I find in plaintiffs' favor as to:

a) Medical care at OSP;

b) Pasteurization at the Annex; and

c) Fire Safety at the Annex.

The foregoing constitute findings and conclusions pursuant to Rule 52, Fed.R.Civ.P. If either side believes that the findings as to any specified claim are insufficient to support the conclusion of law as to that claim, it should file a comprehensive statement, by a date to be fixed by the Court after a phone conference. The statement

---

**17.** Mr. Hoover found other violations of fire safety standards at OSP: (1) none of the living units have sprinklers; (2) there are no heat detectors or fire alarms in the living areas; (3) fire exits are too far from the cells; and (4) pillows, barber chairs, and recreational furniture contain polyurethane, a highly flammable material. Mr. Hoover faulted OSCI for, among other things, its lack of sprinklers and its use of the side tiers for recreation areas thereby blocking fire exits. As with the Annex's pasteurization operation, I do not believe it necessary to pass on whether these violations of standards—to the extent they are not also violations of state law—require remedial action. Or.Rev.Stat. § 179.360(1). I find none to portend of an inevitable injury.

should include proposed supplemental findings and conclusions. Plaintiffs will be entitled to an award of attorneys fees; a schedule will be established for submission of papers relevant to this aspect.

IT IS SO ORDERED.

## APPENDIX

### Population of Oregon State Penitentiary, 1982

| As of midnight: | OSP | S/I Unit | Annex |
|---|---|---|---|
| May 31/June 1 | 1513 | 94 | 210 |
| June 30/July 1 | 1482 | 84 | 217 |
| July 31/Aug. 1 | 1484 | 75 | 206 |
| Aug. 31/Sept. 1 | 1499 | 104 | 208 |
| Sept. 30/Oct. 1 | 1503 | 101 | 210 |
| Oct. 31/Nov. 1 | 1522 | 99 | 218 |
| Nov. 31/Dec. 1 | 1505 | 105 | 198 |
| Midnight Dec. 26 | 1506 | 80 | 191 |

---

### OSCI

| Average daily count for month of: | | Numbers as of midnight: | |
|---|---|---|---|
| April | 843 | April 30/May 1 | 852 |
| May | 862 | May 31/June 1 | 862 |
| June | 892 | June 30/July 1 | 919 |
| July | 948 | July 31/Aug. 1 | 963 |
| August | 961 | Aug. 31/Sept. 1 | 976 |
| September | 972 | Sept. 30/Oct. 1 | 992 |
| October | 1018 | Oct. 31/Nov. 1 | 1023 |
| November | 1006 | Nov. 30/Dec. 1 | 1018 |
| December (Dec. 1–28) | 1003 | Dec. 28 | 988 |

All Time High Population of 1036 recorded on October 26, 1982

## SUPPLEMENTAL OPINION and ORDER

In the opinion filed December 30, 1982, I reserved ruling on the mental health care issue. This supplemental opinion constitutes my ruling on that issue. It contains findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P. The opinions, taken together, will form the basis for filing a judgment, Fed.R.Civ.P. 58, as well as for determining such ancillary matters as costs and attorney's fees.

In the December 30, 1982 opinion, I invited counsel to propose additional findings to support the conclusions of law. As yet, neither side has responded to my offer. If there are plans to do so, for the original or the supplemental opinion, the parties should submit their proposed additional findings by March 18, 1983.

The plaintiffs' attorneys should submit their petitions for fees and costs by March 25, 1983.

I allowed the State ninety days (from December 30, 1982) to report on its efforts to improve OSP's medical care services. When I have received that report, I will enter an appropriate judgment, including injunctive relief or other such relief as is necessary to carry out these opinions.

### F. Mental Health Care and Counseling

I discussed the general eighth amendment principles and standards relating to the provision of minimally adequate medical care in the Medical Care section of the opinion. These requirements apply to mental health care as well.[1] *Hoptowit,* 682 F.2d at 1253, *see Ohlinger v. Watson,* 652 F.2d 775, 777 (9th Cir.1980). In short, an inmate suffers eighth amendment pain whenever he must endure an untreated serious mental illness for any appreciable length of time. *Robert E.,* 530 F.Supp. at 939.

To provide minimally adequate mental health care, the State must have sufficient numbers of trained staff to identify and treat those treatable inmates suffering from serious mental disorders. *See Ruiz v. Estelle,* 503 F.Supp. 1265, 1339 (S.D. Tex.1980), *aff'd in part, rev'd in part,* 679 F.2d 1115 (5th Cir.1982). To show the State fails to meet this obligation, the inmates must demonstrate a pattern of suffering sufficient for me to presume the prison administrators have, through their programs and procedures (or lack thereof), created an environment in which it is unacceptably likely a serious mental illness will go untreated. *Robert E.,* 530 F.Supp. at

---

1. The inmates do not challenge the State's provision of dental care services. In stark contrast to OSP's medical services and mental health services at OSP and OSCI, dental health care is readily and expertly available.

940. Only when the inmates establish the State is thereby deliberately indifferent to their serious mental health needs can I explore the causes of that indifference to fashion a remedy.[2]

■ Dealing with the question of whether the inmates have met their burden on this issue is more difficult than on the medical care issue. There are three reasons for this. First, there is considerable room for disagreement and debate among psychiatrists and other mental health professionals as to what is a serious mental illness for which the denial of adequate treatment causes constitutionally-cognizable pain.

Despite many recent advances in medical knowledge, it remains a stubborn fact that there are many forms of mental illness which are not understood, some of which are untreatable in the sense that no effective therapy has yet been discovered for them, and that rates of 'cure' are generally low.

O'Connor v. Donaldson, 422 U.S. 563, 584, 95 S.Ct. 2486, 2498, 45 L.Ed.2d 396 (1975) (Burger, C.J., concurring) (citation omitted). As the Fourth Circuit has remarked: "Although it is possible to categorize some forms of mental illnesses, diagnosis remains 'an extremely subjective art.'" Bowring v. Godwin, 551 F.2d 44, 48 n. 3 (4th Cir.1977). The diagnosis of mental illnesses is made tougher still because it is easy for inmates tired of their boring, "restrictive and even harsh" routines to feign the symptoms of mental illness to effect a change in their environment. See K. Kesey, One Flew Over The Cuckoo's Nest 44–45 (1962). It is safe to say that the inmates must show, at a minimum, that they suffer from illnesses such as acute depression, paranoid schizophrenia, psychoses, or nervous collapse. Robert E., 530 F.Supp. at 939. The eighth

amendment does not require the State to solve inmates' behavioral, emotional, and personality problems. See Hoptowit, 682 F.2d at 1254–55.

Second, psychiatrists themselves differ on the underlying theories and thus on the methods of treatment. Bowring, 551 F.2d at 48 n. 3. This state of the psychiatric art makes it all the more difficult for me to distinguish between cases that show inmates receiving, on the one hand, constitutionally inadequate treatment, and, on the other hand, treatment about which mental health professionals could reasonably differ. The Constitution requires I intervene in the former cases; however, the latter are beyond my purview. As the Supreme Court said in another context: "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." Youngberg v. Romeo, —— U.S. ——, ——, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982) quoting 644 F.2d 147, 178 (3rd Cir.1980) (Seitz, C.J., concurring).

Third, unlike their medical care counterparts, mental health care providers face an additional hurdle in treating their patients: the patient must acknowledge his illness and cooperate with those attempting to treat him. A large number of mentally ill patients, not just inmate-patients, refuse to cooperate with their doctors. O'Connor, 422 U.S. at 584, 95 S.Ct. at 2498.

■ The inmates must, therefore, show a pattern of cases, each of which discloses, with little or no room for reasonable mental medical opinions to differ, (1) a serious mental illness (2) for which the inmate wants treatment (3) which he does not re-

---

2. The inmates cite the following inadequacies:
 (1) too few trained staff members;
 (2) use of PSU for administrative segregation;
 (3) misuse of PSU siderooms;
 (4) poor recordkeeping;
 (5) lack of continuing education programs for the staff;
 (6) misuse of psychotropic drugs;
 (7) security decisions override physician treatment decisions;
 (8) no peer review system; and
 (9) inadequate "follow-up care."

ceive (4) thereby causing the inmate to suffer mental pain.

Before addressing the inmates proof, I describe briefly the mental health care and counseling services.

*OSP/Annex.* OSP has a 47-bed Psychiatric Security Unit (PSU) with seclusion cells called "side rooms." [3] PSU is not an open dormitory ward like the OSP infirmary. The inmates live in and out of cells as do those in the tiers of the main prison populations.

PSU is designed to provide crisis intervention care, such as suicide prevention and detoxification, for inmates at OSP, OSCI, and the Annex. The unit is usually filled close to capacity. On my tours I observed that about half of the inmates remained in their cells. The remainder wandered or sat around the ward.

Dr. Wesley Weissert, a staff psychiatrist at the Oregon State Hospital, spends up to fifteen hours a week at PSU (out of a total of twenty at OSP). A nurse is at PSU forty hours per week. There is no mental health staff at PSU after regular weekday working hours. There are four correctional officers on the day and swing shifts and two on the night shifts.

Dr. Weissert is available about six hours per week to treat inmates in the general population. He sees sixteen to twenty patients each week. During this time, Dr. Weissert evaluates new patients and re-

views established patients. He says he spends fifteen minutes with each new patient and twenty minutes with each inmate receiving care on an out-patient basis. Dr. Weissert also sees two to four inmates a week in S & I for a total of one hour.

OSP has a psychology department with an open door policy. Dr. Jack Seidler and Mr. John Caywood work full time providing informal counseling to inmates in the general population.[4] They also make weekly trips of fifteen to sixty minutes to S & I. Dr. Seidler has a Ph.D. in psychology. Mr. Caywood has a B.S. in psychology and sociology.

*OSCI.* The sum total of in-house mental health care for inmates at OSCI is the two hours per week Dr. Weissert spends there. He sees twenty five to thirty patients a month. There is no psychology staff. Until June 1981, OSCI had a psychology department staffed by a psychologist, a psychological counselor, and a correctional counselor. OSCI also contracted with two psychiatrists who each provided at least six hours of services per week. For example, Superintendent Sullivan reported the psychiatrists scheduled ninety-nine consulting hours during December 1980. In this period, the psychiatrists held 345 interviews and treatment sessions. At that time the population was about 750.[5]

Because Dr. Weissert's time is so limited, he confines his consultations to inmates in the general population. If an inmate is

---

**3.** The side rooms approximate the conditions in the segregation unit. In PSU, however, the inmates are deprived of all diversions. The side rooms are small bare cells with large solid doors that shut in much of the noise. Inmates confined in side rooms are not allowed contact with other inmates and are not afforded an opportunity for regular exercise. They are allowed outside the side rooms for about twenty minutes a day.

**4.** The psychology department does not keep records of these sessions so I have no way of determining the numbers and duration (and hence significance) of these encounters. Dr. Seidler testified he sees about twenty inmates a week. Mr. Caywood testified he counsels forty

inmates a week individually and twenty more in group sessions.

**5.** Because the population now hovers around 1000, one would expect a proportionate increase in the mental health care staff. Instead, faced with mounting budget deficits, the legislature all but eliminated mental health care at OSCI. I have grave doubts whether this move will, in the long run, save the State money.

If the State provided 100 consulting hours per month through much of 1981, but schedules only 10 hours per month today, one is left with the conclusion that the State either provided too much mental health care in previous years or provides too little care today. Not even the stanchest advocates of incarceration

transferred to the segregation unit, his treatment is discontinued.[6]

*Outside Sources.* Correctional Institution Treatment Services (CITS) consultants of the Mental Health Division provide group and individual counseling to inmates who are substance abusers, sex offenders, Vietnam veterans, and mentally and emotionally disturbed. Because about half of Oregon's prisoners have substance abuse problems, the waiting list for that program is particularly long. The CITS program employs thirteen consultants or counselors, each of whom work on average one day a week. The consultants' qualifications range from those who have not obtained a bachelor's degree to licensed psychologists and even a psychiatrist. Thomas Lester, CITS's Unit Director, aims to serve up to 200 inmates per week in 76 counseling hours at OSP, and 88 inmates per week in twenty-nine counseling hours at OSCI. OSCI monthly reports indicate consultants actually spend fewer hours at the institutions.

The CITS program does not serve inmates in PSU or the segregation units. If an inmate is sent to PSU or to segregation, his counseling is discontinued.

The Mental Health Division's Correctional Treatment Program (CTP) offers four residential treatment programs at the State Hospital. These programs are: a 25-bed ward mental emotional disturbance unit, a 31-bed sex offender unit, a 31-bed social skills unit, and a 30-bed drug and alcohol unit. The total capacity of these programs is 117. There are waiting lists for all but the social skills program. With the exception of the MED program, inmates must be within one to three years of release to enroll in the hospital programs.

CTP has a program director with a Doctor of Criminology, and a psychiatrist, a psychologist, and four registered nurses. Each of the individual programs has a director with a doctorate or master's degree,

therapists (most of whom have master's degrees) and twelve psychiatric aides.

On the inmates' behalf, Dr. Paul Lowinger, an Associate Clinical Professor of Psychiatry and Community Medicine at the University of California School of Medicine in San Francisco, evaluated the performance of the prisons' mental health care staff and the adequacy of mental health care in general. Dr. Lowinger talked with and reviewed the files of six inmates housed at PSU. Following his tour, Dr. Lowinger examined in detail the PSU, medical, or prison files of thirteen other inmates. Of these thirteen, five were chosen at random from the psychology department's out-patient files.

I cannot find the cases Dr. Lowinger reviewed represent the mental health care provided the plaintiff class as a whole. *See Todaro*, 565 F.2d at 51–52. Like Dr. Della Penna, Dr. Lowinger examined the records of some of the inmates who testified in this case, and some of those who were on the ward at the time of his visit. However, unlike Dr. Della Penna, Dr. Lowinger did not examine in detail a significant number of randomly selected files. Many of the records Dr. Lowinger studied were supplied by plaintiffs' counsel presumably because they were thought to show improper care. Notably, of the five cases selected at random, Dr. Lowinger discussed none in detail.

Dr. Lowinger also talked with inmates throughout the prisons and examined other randomly selected records. These encounters helped form Dr. Lowinger's general conclusions; he did not cite any specific examples from them of inmates suffering the effects of untreated serious mental illnesses.

Even if the sample of cases Dr. Lowinger examined were representative of the mental health care at the prisons, Dr. Lowinger identified too few cases of untreated serious mental illnesses to demonstrate that "systematic deficiencies in staffing, facilities or

as punishment, as opposed to rehabilitation, contended the inmates received too much care.

**6.** This decision is somewhat surprising. Dr. Seidler testified that inmates in the segregation unit have more mental health problems than do those in the general population.

procedures make unnecessary suffering inevitable." *Todaro,* 565 F.2d at 52. Dr. Lowinger found the care in ten of the eighteen cases to warrant detailed exposition. Of these, Dr. Lowinger identified only one inmate with a serious mental illness who wanted treatment he did not receive. This is particularly telling in light of the testimony of the State's expert witness, Dr. Robert Powitzky, Regional Administrator, Psychology Services, South Central Region, U.S. Bureau of Prisons. Dr. Powitzky did not examine any inmate files as did Dr. Lowinger, but he toured the whole of the Corrections Division's mental health facilities. He "was impressed with the range of services offered" and found no inmate suffering from an untreated serious mental illness.

The one case Dr. Lowinger identified on which I could base an order restructuring mental health services is that of E.W.[7] E.W. is paranoid. He takes neuroleptic medicine to control his condition. Dr. Weissert abruptly withdrew E.W.'s medicine to see if his paranoia would return. It did with a vengeance. Dr. Weissert put E.W. back on his medicine. Had there been a larger treatment staff, Dr. Weissert could have withdrawn E.W.'s medicine slowly and monitored his condition. This would have saved E.W. unnecessary pain.

The rest of the purportedly representative cases can be put into three categories.[8] First, there are inmates who may have serious mental illnesses but who have not been shown to suffer from a lack of adequate treatment (E.S., D.S., and J.D.). For example, J.D. exhibits "secondary psychotic symptoms" for which he receives medicine. Dr. Lowinger believes J.D. needs vocational training but does not attribute any pain J.D. may suffer to that lack of that training. Second, there are inmates who suffer from untreated serious mental illnesses because the inmates refuse to cooperate with the treatment staff (D.H. and E.W.).

In the third group are those inmates who have asked for and been refused treatment but who have not been shown to suffer from a serious mental illness (A.B., D.S., and S.K.). These cases describe inmates with behavioral and emotional problems. The inmates say they want to deal with these problems so they can better cope with the world. This is not only a commendable desire but one that society should encourage by making the desired help available. Oregon is a less safe place to live because its

---

7. I believe it will not disserve the public interest to refer to the inmates by their initials. *See Robert E.,* 530 F.Supp. at 934 n. 5. The individuals involved and counsel know to whom the initials refer. If an appeal is taken, I will furnish a list of names corresponding to the initials here.

8. One case that does not support the structural challenge nonetheless deserves special emphasis. P.H. is a transsexual. He does not contend he is mentally ill. In fact, P.H. likes his sexual orientation. What P.H. wants (that he does not receive) is counseling to help him adjust to his anomalous proclivities. During an earlier stay in the custody of the Corrections Division, P.H. was treated at the State Hospital. The staff there believed the best treatment for him was simply to let him act like the woman he thinks he is.

In 1981 and 1982, P.H. was sentenced to OSP. The prison administrators there assigned him to PSU. However, other than his sexual orientation, there is little indication P.H. suffers from a serious mental disease. On each occasion he was housed at PSU, P.H. disrupted the ward by propositioning patients. The staff placed P.H. in a side room where he remained for two two month periods. In essence, P.H. was given the option of conforming his behavior to that of one of his physiologic gender or remaining in a side room. Because he was unwilling or unable to act like a man, P.H. remained in a side room for most, if not all, of the time he spent in PSU.

Dr. Lowinger determined from staff notes that P.H. went "stir crazy" and suffered considerable mental distress from being in seclusion for so long. I have little trouble concluding P.H. suffered unnecessarily. When P.H. was in PSU, OSP had no administrative segregation unit. Now that OSP has separate housing for inmates who, though not ill, must be segregated from the general population, I expect this kind of misuse of the side rooms will not continue. Because side rooms are harsher quarters than even the segregation cells, it is important the staff limit its use of the rooms to the control of violent disruptive behavior.

In this case, as in the others discussed here, I express no opinion whether the State's conduct constitutes grounds for an individual's action for damages under 42 U.S.C. § 1983.

people, their elected representatives, or both, choose not to assist these efforts at self-improvement. But the lack of rehabilitative therapy—as opposed to treatment for serious mental illness—is not cruel and unusual punishment. *See Hoptowit,* 682 F.2d at 1254–55.

I do not wish to have this opinion interpreted as a favorable report on Oregon's care for its mentally ill inmates. I hold only that the inmates have failed to prove their care, or lack of it, amounts to cruel and unusual punishment.[9] On the whole, I agree with many of Dr. Lowinger's general observations. Inmates, even those at PSU, have infrequent contact with the treatment staff. There appear to be no articulated treatment plans. PSU records are so badly kept it is as if they did not exist. This is not to say the staff turns a deaf ear to inmates' pleas for help. Given the meager resources the legislature devotes to mental health care, the staff must make choices they would rather not as to who gets mental health care and how much of it.

One further point requires elaboration. Though the State says PSU functions as a crisis intervention center, the majority of PSU's patients are chronically ill.[10] Dr. Powitzky reported thirty inmates in PSU were there because of active or partially remissive psychoses. He also identified three other inmates suffering from severe depression. The only treatment afforded these patients is psychotropic medicine. As such PSU serves as a large holding pen for mentally ill inmates.

As with the grievously minimal care at OSCI, I am left with the firm conviction that inmates must be suffering from un-

treated mental illnesses. But on this record, I am unable to find a pattern of cases, or to make other findings, which would support that conclusion. The most I can find from this evidence is there are inmates in the prisons who suffer from chronic mental illnesses and these inmates are specially housed at PSU. The record reveals nothing about the nature of the illnesses these inmates suffer or the pain they endure from the lack of adequate treatment.

I believe the inmates may be able to marshal a prima facie case. It may be that the effects of untreated illnesses have not had time to manifest themselves. When I held the hearings on mental health care and counseling in August 1982, OSCI's psychology department had been gone for a year and Dr. Weissert's tenure as OSCI's only mental health provider had just begun.

This is not the first time mental health care in Oregon's prisons has been found wanting. *See Ohlinger,* 652 F.2d at 778–80. Because the inmates have not established the existence of a constitutional violation for me to remedy, I fear this will not be the last time a court will be called to do that which the executive and legislative branches will not.

---

**9.** If my task were that of a philosopher, or even, perhaps, that only of an interested observer, the language in this opinion would be somewhat different. OSCI is an institution which nearly doubled its population in about eighteen months, and, at the same time, wiped out its mental health staff. One need not be a Plato to be able—indeed, compelled—to wonder whether it is the kept or the keeper who is

mad. But my task here is that of a judge, and thus I eschew any such observations.

**10.** "[A] non-dangerous, chronically mentally ill inmate .... is a management problem in that he/she may become victimized, often breaks institutional regulations, and may be a source of unrest among other inmates." (Powitzky Witness Statement at 4).